## BUSHNELL vs. BELOIT.

### APPEAL FROM CIRCUIT COURT, ROCK COUNTY.

Heard October 12, 1859.]                    [Decided January 4, 1860.

*Constitutional Law—Corporations—Coupons—Assignment.*

An act of the legislature authorizing the town of Beloit to subscribe for the stock of a railroad company, and to incur indebtedness for making internal improvements, is a valid act; and the corporation is liable for the payment of such indebtedness.

The courts will not declare an act of the legislature authorizing a municipal corporation to subscribe for stock in a railroad company, unconstitutional solely on the ground that such legislation is not wise and wholesome, but is evil and pernicious in its consequences.

The evident intent of Art. VIII of the constitution of Wisconsin in restricting the legislature from contracting state indebtedness for works of internal improvement, applies only to the state finances, and was not designed to regulate those of the towns, counties and cities, or to restrain them from loaning their credit in aid of such works; but these, when properly authorized, may contract such indebtedness, and become parties to such works.

A town, city or county, may give or loan its credit in aid of a corporation, without the credit of the State becoming pledged in any way thereby. The indebtedness would be that of the town, &c., and not of the state.

It is a well settled political principle, that the constitution of a state is to be regarded not as a grant of power, but rather as a limitation upon the powers of the legislature; and it is competent for the state legislature to exercise all legislative power not forbidden by its own constitution, or that of the United States, or delegated to Congress.

Bushnell vs. Beloit.

The state legislature may authorize that to be done by another which the state cannot itself do, by reason of a prohibition in the constitution. This principle is based upon the unrestricted power in the legislature to create corporations, or allow individuals to do acts inhibited to the state to engage in. Art. IX of the constitution of Wisconsin is consonant to this principle.

The case of *Peck vs. Norton*, 3 Wis., 714, alluded to and approved.

Section 3, Art. XI, of the Constitution of Wisconsin, clearly recognizes the principle that municipal corporations may be clothed with power to "borrow money," "contract debts," and to "loan their credit." The fact that it was required by the legislature to restrict the power of these corporations in these respects, is evidence that the power existed; as a power cannot be restricted unless it exists.

The constitution of Wisconsin neither expressly nor by any fair implication, prohibits the legislature from granting the power to towns, cities and counties, to subscribe for the stock for the construction of railroads in which they are interested, and to issue their bonds therefor.

An act which authorized a town to subscribe for the stock of a railroad, is sufficient authority to the railroad company to receive the subscription and to take the bonds of the town as pay for the stock.

A power in a town to issue bonds to pay for stock in a railroad, carries with it the incidental power to issue them in a negotiable form, and to give them the character belonging to that class of securities in the market.

This action was brought to recover interest on coupons attached to town bonds issued by the town of Beloit, for the purpose of aiding the construction of the Racine and Mississippi railroad. The bonds were issued under an act of the legislature, approved February 10th, 1853. Sess. Laws, 1853, 12.

The 1st section of the act provided that "The board of supervisors of the town Beloit are hereby authorized to subscribe for the town of Beloit, one hundred thousand dollars to the capital stock of a railroad company authorized to construct a railroad from the city of Racine to the village of Beloit, and to pay for the same in the bonds of said town, payable in twenty years with interest, payable annually, in the city of New York, not exceeding seven per cent." Section 5 provided " no bonds shall be issued in pursuance of the provisions of this act, until a majority of the legal voters of said town, voting upon said question, shall vote in favor of the same at an election called for that purpose, to be held in the village af Beloit. At such election, those voting in favor shall vote a ballot with the words inscribed thereon, ' for the railroad;' and those voting against, shall vote a ballot with the words inscribed thereon, ' against the railroad.' One week's

previous notice of said election shall be given in a public newspaper printed in the village of Beloit; and this act shall be published in connection therewith.   Said election shall be conducted, and the returns thereof made and canvassed in the same manner as the annual town meetings of the said town."   The act also charged the stock of the town with the payment of the principal of the bonds, and required the town to levy taxes from time to time, sufficient to pay the interest.

The suit was brought to recover from the town the amount due upon a coupon attached to one of the bonds issued to the railroad company and assigned to the plaintiff, and for value, and without any actual notice of the defense of the town, and upon an answer putting the liability of the town thereon in issue, the trial in the circuit court proceeded.   On the trial it was proved that that the following " election no- tice" was published in the " Beloit Journal," on the 31st of March, 1853 :

"An election will be held at Burrough's Hall, in the village of Beloit, on Thursday, the 7th day of April next, to com- mence at nine o'clock A. M., for the purpose of determining by a vote of a majority of the legal voters of the town of Be- loit voting at such election, whether the board of supervisors of the town of Beloit shall subscribe for the town one hun- dred thousand dollars to the capital stock of a railroad from the city of Racine to the village of Beloit, and to pay for the same in the bonds of the town, in pursuance of the provisions of the foregoing act of the legislature of the state of Wiscon- s n.                          [Signed by the Supervisors.]
"Dated March 28th, 1853."

The same newspaper contained the act of the legislature authorizing the town of Beloit to aid in the construction of the road, &c.   The record of the election in accordance with the notice, was also proved, showing that the whole number of votes cast were 388, for the railroad 321, and against the railroad 67; making a majority of 254 in favor of the sub- scription to the stock of the railroad.   On the 5th of October, 1853, the supervisors of the town passed a resolution to issue town bonds numbered from one to fifty, for $1,000, and from 51 to 150, for $500 each; making $100,000, and to deliver them to the Racine and Mississippi R. R. Co.

On the 8th of March, 1853, the railroad company passed a resolution to accept the bonds of the town for the stock of the

road, to the amount of one hundred thousand dollars, payable in the bonds of the town of Beloit, running twenty years, bearing 7 per cent. interest, payable annually in the city of New York, and conditioned that the road from Racine to Beloit be one division, and the stock therein a distinct stock; and also conditioned that the company provide for the payment of the interest on said bonds for said town until the completion of the road to Beloit.

On the 7th of October, 1853, the railroad company passed a resolution instructing their president to accept the town bonds, and deliver the stock of the road therefor; which he did. The stock bears date October 3, 1853. On the 21st of May an agreement was entered into between the town and the railroad company, and signed and sealed by the supervisors and the president of the company, as follows:

"An agreement made and entered into this 21st day of May, 1853, between the town of Beloit, by John Easterly, George B. Sanderson, and Allen Warden, the Board of supervisors of said party of the first part, and the Racine, Janesville and Mississippi Railroad Company, party of the second part. Witnesseth.

"*Whereas,* The Board of Supervisors of the said town of Beloit subscribed for and in behalf of said town, for one thousand shares of the capital stock of said company, by an article of subscription, dated this day, in pursuance of an act of the Legislature of the state of Wisconsin, entitled 'An act to authorize the town of Beloit to aid in the construction of a certain railroad from the city of Racine to the village of Beloit," approved February 10, 1853. Now, in consideration of said subscription, by the town of Beloit aforesaid, and of one dollar in hand, paid by the party of the first part to the party of the second part, the said party of the second part doth hereby covenant and agree to and with the party of the first part, as follows:

"*First,* That the bonds of said town of Beloit, to be issued for the amount of said subscription, shall in no case be sold in market for less than 95 cents on the dollar, without the consent of the Board of Supervisors of said town, or their agent.

"*Second,* That the amount of said subscriptions, as soon as realized, shall be expended upon that portion of said railroad commencing at Beloit and running east to Delavan.

" *Third,* That said company will pay all interest that may accrue on said bonds, up to the time said railroad shall be fully completed to Beloit.

" *Fourth,* That the stock subscribed by the town of Beloit shall be entitled to at least one Director in the Board of said company.

" *Fifth,* That the stock owned by the town of Beloit shall in no case be merged in the stock of any other road, branch, or corporation, whatever, nor be liable to any assessment for any liability or contract of the said company with any other road, branch, or corporation, without the consent of the said town of Beloit, unless the said railroad company shall take, or offer to take the said stock off from the hands of the town of Beloit, at its value in the market, not below par.

" In witness whereof, the Supervisors of the said town, in behalf thereof, have hereunto set their hands and seals, and the said company, by its President and Secretary, has also signed the same, and caused the seal of the said company to be hereunto affixed, the day and year aforesaid."

On the seventh day of October, A. D. 1853, the agreement was ratified and confirmed by the railroad company, by resolution passed by its Board of Directors.

The subscription is as follows:

" In pursuance of an act of the Legislature of the state of Wisconsin, entitled, 'An Act to authorize the town of Beloit to aid in the construction of a certain railroad from the city of Racine to the village of Beloit,' approved February 10th, 1853, and in pursuance of a vote of the electors of the said town of Beloit, given at a special meeting of said electors, duly called and held in pursuance of said act, at Burroughs' Hall, in the village of Beloit, on Thursday, the seventh day of April, 1853, at which meeting 321 votes were cast ' for the railroad,' and 67 votes were cast ' against the railroad,' we, the undersigned, constituting the Board of Supervisors of the town of Beloit, do hereby subscribe for, and on behalf and in the name of the said town of Beloit, for one thousand shares of the capital stock of the Racine, Janesville and Mississippi Railroad Company, to be paid in the bonds of said town, payable in twenty years, with interest, payable annually, at 7 per cent., in the city of New York.

" Dated, May 21, 1853."	(Signed by the Supervisors.)

It was admitted on the trial that the act had not been properly published, in the " Beloit Journal," and that the railroad company had violated the provisions of its agreement with the town, in all its particulars.

The following is a copy of bond No. 95, mentioned in the complaint:

"BY SPECIAL AUTHORITY OF THE STATE LEGISLATURE.

"*United States of America, town of Beloit, state of Wisconsin.*

No. 95.                                                    $500

The town of Beloit acknowledge themselves to owe to the Racine, Janesville and Mississippi Railroad Company, the sum of five hundred dollars, for five shares, of one hundred dollars each, in the capital stock of said company, subscribed for and purchased of said company by said town; which sum said town promise to pay to said company, or to the holder hereof, at their office, in the city of New York, on the 10th of February, 1873, and also interest thereon, at the rate of 7 per cent. per annum, payable annually, on the 10th day of each February. And it is further agreed that this obligation, and all rights and benefits arising therefrom, may be transferred, by general or special endorsement, or by delivery, as if the same were a note of hand, payable to bearer.

" In testimony whereof, the Board of Supervisors of said town have caused to be affixed its corporate seal, and these presents to be subscribed by their Chairman, and attested by the Clerk thereof; this 21st day of May, 1853.

"Attest:               M. V. PASCO, Clerk.
[L. S.]               JOHN EASTERLY, Chairman."

" I, M. V. Pasco, Clerk of the town of Beloit, do hereby certify that the foregoing obligation is issued in pursuance of a special act of the Legislature of the state of Wisconsin, entitled 'An Act to authorize the town of Beloit to aid in the construction of a certain railroad from the city of Racine to the village of Beloit,' approved February 10th, 1853, and sanctioned by a majority of the legal voters of said town, at an election held for such purpose, April 7th, 1853.

" M. V. PASCO."

Attached to this instrument were twenty coupons, for the payment of interest annually, on the 10th day of February in each year, from the 10th day of February, 1853, and the form thereof was and is as follows, to wit:

Bushnell vs. Beloit.

"The town of Beloit will pay thirty-five dollars, on the 10th day of February, 1873, at the office of the Racine, Janesville and Mississippi Railroad Company, in the city of New York, on presentation hereof, being the interest due that day on the bond of said town, number ninety-five, issued to said company.

"By order of the Board of Supervisors.

"W. W. DEXTER, Treasurer."

The coupons upon which this action is based, were duly presented at the place of payment therein specified, and payment thereof duly demanded, and payment was then and there refused.

Upon these facts, the circuit judge, who tried the case without a jury, found as follows:

This cause having been fully heard by me, I hereby find, as matter of fact, that all the allegations in the plaintiff's complaint are established by evidence, and are true:

And, as a matter of law, find that the plaintiff is entitled to a judgment against said defendant for one hundred and sixty-two dollars and seventy-eight cents, and costs.

Dated, December 24th, 1858.

By the Court,  A. SCOTT SLOAN, Judge.

In pursuance of the above finding of the Court, judgment was entered for the plaintiff, and against the defendant, for the sum named in such finding, and costs of the action; and from which the town appealed to this court.

The counsel for the parties in this court relied on the same points and authorities as in the preceding case of *Clark vs. The City of Janesville.*

*J. H. Knowlton,* for the appellant, relied upon the following argument, in support of the defense set up:

There are two insuperable objections to the constitutionality of the act. The plaintiff claims: 1. The act imposes a tax, and creates a charge upon the stock contemplated, but was not passed by yeas and nays. 2. It authorizes the town an *integral part* of the state, in its governmental capacity, to become a stockholder or *party* in the construction of a work of internal improvement, and to create a debt for that purpose; and enforce taxation to obtain money for the payment of that debt, when by the constitution the *whole*

*state* could do no such thing.  As to the first point, sec. 8, Art. VIII., constitution reads:  " On the passage in either house of the legislature, of *any law* which *imposes a tax*, or creates a *debt* or *charge,* the question shall be taken by yeas and nays, which shall be duly entered on the journal ; and three-fifths of all the members elected to such house, shall, in *all such* cases, be required to constitute a quorum."

The term, *any law*, includes all laws.  Any law upon subjects particularly mentioned, includes all of the classes enumerated.  The category is exhaustive.  So that there can be no law passed under our constitution which imposes a tax, or creates a debt, or charge, unless the question on the passage of the bill is taken by yeas and nays, and entered on the journal.  Nor can this be done by less than a majority of *three-fifths* of all the members elected to each house.  Nor less this three-fifths vote on the question.  There is no power to pass such law in any other than the way prescribed in this section.  This act *imposes a tax,* and therefore falls within this section of the constitution, and is void because not passed by yeas and nays.  This may be seen by referring to the journals.  Senate Journal, 1853, 109; Assembly Journal, same year, 163.

Can the legislature authorize a debt to be created in a manner different from that in which it could create the same debt?  Clearly not.  Because, if this could be done, the provisions of the constitution requiring legislative power upon given subjects, to be exercised in a manner prescribed, could always be disregarded.  This would render the words of the constitution nugatory, if not meaningless.  This dangerous concession cannot be allowed.  But however this may be, as to the creation of a debt or charge, there is no doubt that the act, in the most direct language, imposed a tax.  Every holder of these town bonds is bound to know whether the town had lawful authority to issue them.  If there was a lack of lawful power, the bonds are void ; and no amount of ignorance of the want of power, can entitle a party to recover upon them.  It is like a deed executed by an apparent attorney under a forged power.  No title nor estate could pass by such a deed, because there would be a want of power to that end.  The face of the bonds show that the town officers professed to act under a special authority.  Every holder can, and at his peril must, find out whether that special power did in fact, and in law exist.  If the enactment was unconstitutional, then the power did not exist.

Suppose the town officers should levy a seven thousand dollar tax for the annual interest on these bonds, must they not say "*this act imposes the tax,* and makes it our duty to levy and collect it? Clearly this is their only warrant. But the tax-payer replies, " it is admitted that by the language of the act the legislature imposes the tax, and makes it your duty to levy and collect it; but that act was not passed by yeas and 'nays, as required by the constitution, and is, therefore void. Without voting in this manner, the legislature had no power to pass the act. You, therefore, have no power or duty in the premises." Can there be any doubt that the tax-payer would be right, and that the act, bonds, and tax, would all be void? We think not.

The constitution having made the journal the *record evidence* of how such laws are passed, there is no other way of ascertaining this fact, than by consulting this repository. *Purdy vs. The People,* 2 Hill, 34; S. C. in 4 Hill, 390; 14, Ill., 297.

The constitution clearly protects every person from the payment of any tax which the legislature may impose, unless the enactment under which the right to tax is claimed, is passed by yeas and nays. It also necessarily follows that there is an inhibition upon all to do any thing whatever which may result in taxation under an enactment not thus passed. The inhibition extends to all laws which impose a tax, whether the imposition is co-extensive with the boundaries of the state, or is confined to some local sub-division, makes no difference. The mandatory injunction is co-extensive with the power to impose taxes. The effect of the declaration is, that in all cases where the legislature have the power to impose taxes, they shall only exercise it in voting by yeas and nays. On the first point, therefore, the act must be held unconstitutional and void.

On the second point, the constitution, Art. VIII, sec. 10, declares that " the state shall never contract any debt for works of internal improvement, or be a party in carrying on such works." If the legislature cannot exercise power for either purpose, can that body enable different parts of the state, in their political and governmental capacity to do so? This proposition can only be maintained by establishing the position that power can be obtained from a source where it does not exist. It cannot be doubted that the object sought to be attained by prohibiting the state from contracting any debt

for works of internal improvement, was to completely protect every person from the payment of taxes for the construction of such works, or on account thereof. Taxation can only be imposed or enforced by the exercise of sovereign power in the enactment of laws and the execution thereof. This being so, it conclusively follows that the inhibition is upon the legislative power to pass any law or act, for or on account of works of internal improvements, which, when carried out or executed, will result or ultimate in taxation. This being so, no man can be compelled to pay taxes for the construction of any railroad or canal. Where the legislature have not the power to impose a tax upon all the tax-payers of the state, by a law co-extensive with its territorial limits, they cannot as to such specified object, impose a tax which shall be binding upon a minority of tax-payers, or upon all who reside or own taxable property within territorial limits less than the whole state.

If this can legally be done, then it is clear that the constitution is no protection to a miniority. The great object of written constitutions is to protect minorities against the power of the majority. Unless this object is maintained *intact,* constitutions are of no earthly use.

Our constitution either does or does not operate upon and protect *each* individual the same as it does all others of the body politic. If it does not, it is discriminative and partial. If it does, the reverse is the case. If then, it is not partial and discriminative upon this subject, all may be taxed for works of internal improvement, or else no person can be. In other words, what cannot be done upon this subject as to all, cannot be done as to one, or any number less than all. Can it be shown that it was not the intention of the framers of the constitution, and of the people in adopting it, to protect all, from the payment of taxes for works of internal improvement, or in other words, was not, and is not this the intention of the above recited inhibitory words ?

The state cannot contract any debt " for works of internal improvement, or be a party in carrying on such works," for the reason that either would involve taxation. The sole essence of the provision is to prohibit taxation for such works. The state in point of territory includes all the towns as its parts. The whole sovereign power cannot authorize, or create a debt for such purposes. How then can a part of a state do so ? This cannot be done, unless a part of the sovereignty has more power than the whole. But the state is, by the very

words of the constitution, prohibited. A prohibition of the whole must be a prohibition upon all the parts of that whole. Without special authority conferred, no town can subscribe for such stock in any railroad company, or contract any debt for the construction of a railroad, or be a party in carrying on such such work. No town can have such power unless it can be, and is derived from the state. By the constitution, the state is prohibited from doing any of these things. The town to have the power, must get it from a source where it does not exist. Both the town and state are destitute of this power. The act in question, therefore, presents the anomaly of two powerless bodies creating a power.

Judge Ranny, in *Cass vs. Dillon,* 2 Ohio St. R., 632, says: "The third section of the same article provides: Except the debts above specified, in sections one and two of this article, no debt whatever shall hereafter be created by, or on behalf of the state.

"Sec 4. 'The credit of the state shall not, in any manner, be given or loaned to or in aid of any individual, association, or corporation whatever; nor shall the state ever hereafter become a joint owner, or stockholder, in any company or association in this state or elsewhere, formed for any purpose whatever.'

"Sec. 5. 'The state shall never assume the debts of any county, city, town or township, or of any corporation whatever, unless such debt shall have been created to repel invasion, suppress insurrection, or defend the state in war.'

"And again, in the article on finance and taxation, (art. 12, sec. 6,) still bearing in mind that the embarrassments of the state have mainly arisen from indebtedness incurred for internal improvements, and apparently to make assurance doubly sure, it is declared: 'The state shall never contract any debt for works of internal improvement.' The chief object of these provisions, in their application to the state government, are too manifest to require comment. In the most explicit and cogent language, they prohibit the state from contracting or assuming, either directly or indirectly, any indebtedness whatever, except for the purposes allowed in the first and second sections of the 8th article. And the fourth section of article 8 is equally explicit in denying the right of the state to become a joint owner or stockholder in any company, for any purpose whatever.

"The moment the constitution took effect, all legislation

then existing authorizing the creation of any such liability, it is admitted, was instantly repealed, and the authority revoked. But, it is claimed that these sections only operate to restrain the state government, as their representative of its sovereignty, from assuming liabilities to bind the whole state, while they leave its *political* divisions under authority of law, free to construct public improvements, and if necessary, and deemed expedient, to incur any amount of indebtedness for that purpose.

" It is wholly unnecessary in the decision of this case, to determine this question, since the particular form of indebtedness here attempted to be incurred is, in my opinion, expressly prohibited by the 6th section of the 8th article, to which I shall particularly allude in the further progress of this opinion; and I have introduced the sections already quoted, chiefly for the purpose of showing the great care evinced by the convention to put a final end to what was justly regarded a formidable evil. But if the position is tenable, it must be admitted the constitution contains no guaranty whatever to the tax payers, against being involved in indebtedness to any extent for internal improvements, through the medium of counties, except in the particular mode of loaning their credit, or subscribing to the stock of corporations. I am therefore unwilling to pass it in silence, or to suffer the opportunity to escape without saying that I am very far from yielding it my assent. I should hesitate long before coming to the conclusion that the great object of these provisions could be thus easily and obviously evaded. I may admit that the precise import of the language employed, where the letter only is regarded, may be open to this narrow construction.

" But the construction of a penal statute, and a remedial legislative enactment, or constitutional provision, involve very different considerations; and this case, throughout, furnishes another and forcible illustration of the absolute necessity, in the latter class of cases, of comprehending clearly the spirit and object of the provision, and of holding that cases within its *equity* are included within it, and governed by it.

" However sagacious and intelligent legislators may be, no human intelligence can foresee the infinite variety of circumstantial variation that may arise in cases to which the reason of the rule extends; and however voluminous a code of laws may be, such cases can never all be subjected to a precise description.

" If this be true of statutory enactments, how eminently so of constitutional provisions, necessarily expressed with brevity, and designed to declare great principles, in the fewest possible words?

" To the judicial tribunals belongs the duty of applying these to individual cases, often a work of difficulty, and requiring the exercise of the highest powers of judgment and discrimination; and in the discharge, duty, the polar star to guide the judicial mind, should be the object intended to be accomplished by the provision. And it should be so construed as to preserve this in full vigor, unimpared by evasion, although in doing so the letter may not be strictly adhered to.

" Now, what object was intended to be accomplished by prohibiting the state from contracting 'any debt for purposes of internal improvement?' The answer is plain, palpable and undeniable, that it was designed to protect the people of the state from the delusion, embarassment and onerous taxation to which they had before been subjected. It was not the state as a mere ideal abstraction, unconnected with her citizens and her soil, that needed protection; but the state, as composed of her people, and their territorial organizations of towns, cities and counties of which it was made up. It was not the name of a state debt against which it was intended to guard, but the burthens which such a debt imposed upon the property of the citizens of the state. It was not the particular form in which the liability might be incurred, or whether its payment was imposed upon all or only a part of the people; but it was intended to give every citizen a constitutional guaranty that no debt was to be contracted for that purpose which might ultimately involve taxation for its payment, and to afford him a sure protection against the unwelcome visits of the tax gatherer, calling for money to pay such indebtedness, that this section was inserted.

" Upon any other construction, it is scarcely worth the parchment upon which it is written.

" For, if the legislature may authorize one county to incur such indebtedness, it may authorize all; and if it may authorize them to do it, it may, with still less doubt, require it to be done. And in this way a debt to any amount may be contracted under its authority, for a prohibited purpose, with its burden imposed on all the property of the citizens of the state, and subjecting them to the same oppressive taxation as

though the same was assumed directly by the state. The provision would thus wholly fail to effectuate its manifest and substantial objects, and its protection be reduced to a mere shadow; since it would matter little to the tax payer whether his property was taken to pay a debt for that purpose, nominally incurred by the county or state.

" The construction for which I contend is entirely consistent with the language of the section, and I think demanded as the result of the principles already settled in this court. The legislative power of the state, in the exercise of sovereign authority, can alone authorize the construction of internal improvements. A county is invested with no single attribute of sovereignty, and, under the constitution, cannot be.

" When its organization is employed for carrying into effect a law of that character, it is used as a mere instrumentality, a means in the hands of the legislative power to accomplish its purposes, and can do nothing but execute some subordinate function. 1 O. State R., 89, 95.

" In virtue of its own powers, therefore, a county cannot construct these improvements, and, of course, cannot contract a debt for the purpose. If a debt is contracted, it must, from the nature of the thing, be contracted by the state through its legislative department, whether the payment of the debt is imposed upon the state, or a county; or, in the latter case, whether it is voluntarily assumed by the county or forced upon it. What the state cannot do directly, it certainly cannot do indirectly.

" Constitutional and statutory provisions and legal rules would become little less than a burlesque if they possessed so little vitality as to be subverted and made powerless by indirect attacks upon the principles they are established to sustain.

" Now, it is positively declared: ' The state shall never contract any debt for purposes of internal improvement.'

" It is by no means clear that the precise language of the section is not invaded when a debt is authorized or commanded by the law-making power of the state, for this purpose, although its burden is cast upon one or more counties. But, if it is not, is it not a sheer and palpable evasion of the spirit and purpose of the provision, to allow the same object to be attained by the use of interdicted means, imposing the same burden upon a part or all of those intended to be pro-

tected, and followed by the same oppressive taxation? I think it is; and such was evidently the opinion of the court of appeals in Kentucky, in the 'case of *Slack et al. vs. Maysville & Lexington R. R. Co.*, 15 B. Monroe, upon a provision of the constitution of that state, much less explicit than this, although it did not become necessary in that case definitely to settle the question.

" If it is so, and if the constitution, in protecting the people of this state from this evil and oppression, has necessarily protected all its organized parts, and every individual citizen, it follows that this attempt to create a debt for internal improvements, under legislative authority, is inoperative and void, as it stands confessed that this provision of the constitution was absolute and imperative, from the time the instrument took effect. If this is not the true construction, the next fitful fever that seizes the legislative body, may, with the utmost facility, plunge us into another twenty million debt, and call for another half century's endurance, by apportioning its burden upon the counties of the state, and calling it the debt of the counties, instead of a state debt; notwithstanding the utmost anxiety is everywhere apparent to prevent such a result."

Again, on page 641, the same judge, speaking of the Clinton-county case, says: " The corner stone upon which the opinion is based, is found in the fact that the General Assembly was invested with express authority to construct internal improvements, and unrestricted in its choice of instrumentalities and means, to attain the end. A county, it was held, might be employed as such instrumentality, and indebtedness and taxation, as lawful means, at the time the power was exercised, and the obligation incurred by the subscription.

" But everything was made to depend for its validity and force upon the exercise of the sovereign power with which the legislative body was clothed, at the time the acts were done; and which it could neither delegate nor surrender. Here, the same acts are attempted to be performed, and the same obligations incurred, under the legislative authority of a government, not thus unrestricted in its choice of means, but expressly prohibited from authorizing what has actually been done."

This reasoning of Judge Ranny has not been, and it is believed that it cannot be answered. The majority of the court

Bushnell vs. Beloit.

seem to admit that this construction was correct. They simply decide that the legislative act in question, having become law under their old constitution, was not abrogated by the taking effect of the new constitution.

Upon examination of the numerous cases which have been decided in the various states, sustaining the constitutionality of legislative acts, it will be seen that they are all based upon the fact, that the state in its sovereign capacity, had the power and authority to become a party, or to be the sole party in the construction of the specified works of internal improvement, with full power to create debts therefor, and to enforce the payment of taxes to obtain the money to satisfy such debts: That the state was in no way restricted as to the manner, the locality, or time when these powers should be exercised. In other words, as to this whole matter, the will of the legislature expressed by legislative enactment, was the measure of state power. That, as a consequence thereof, towns, villages, cities, and counties, might be used as instruments for the execution of this governmental power. That taxation is the exercise of one of the highest of governmental powers cannot be doubted.

Without any elaboration of this proposition, we will assume that it is correctly stated. Towns, villages, cities, and counties, must exert governmental power in the collection of taxes, in order to get money to pay debts contracted for the construction of works of internal improvement. This conceded, how stands the matter if the act in question can be sustained? Clearly in this wise. The whole state cannot exercise the governmental power of creating debts, and enforcing the payment of taxes, for purposes of internal improvement, in and of itself, and in its own name; but with the aid of some part of the state, and in the name of such part, the power may be exercised, in more or less rapid succession, until all the parts become instruments in accomplishing what the whole is prohibited from doing. When all the parts have thus lent their helping hand, they do what the whole cannot do, because prohibited by the constitution. What cannot be done by the state in the exercise of the whole, or entirety of sovereign power, without the aid, approbation, or consent of some of its parts, can be done with such aids, approbation, or consent, from any one of its political, governmental divisions, or parts. In other words, two powerless bodies may create a power. By this governmental, or sovereign legerde-

main, things that cannot be done at once, and by direct means, may be done piecemeal, and by indirect means.

We hold, that unless the meaning and intention of the constitution is that the legislature have no power to pass any act which authorizes or requires, or which may result in taxation in the least degree, in any part of the state, for works of internal improvement, it might as well have contained no word upon the subject of such works. Taxation is the substance of the prohibition upon the state. It is folly to contend that the substance of this inhibition is the mere name of the tax. Different names possess no charm, when the thing to which they may be, or are applied, is all the while the same to those effected or operated upon by that thing. That no part of the state can, by any means whatever, incur any debt for purposes of internal improvement which involves taxation, is consistent with every provision in the constitution. The only other provisions of the constitution which may be supposed to have even a remote bearing upon the question under consideration, are contained in Article XI. Section one of this article declares that "corporations without banking powers or privileges, may be formed under general laws, but shall not be created by special act, except for municipal purposes, and in cases where, in the judgment of the legislature, the objects of the corporation cannot be attained under general laws."

Sec. 3. "It shall be the duty of the legislature, and they are hereby empowered to provide for the organization of cities and incorporated villages, and to restrict their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent abuses in assessments and taxation, and in contracting debts by such municipal corporations."

From this language, it is certain that cities and incorporated villages are municipal corporations. They are denominated "such municipal corporation." It is not now material to inquire what other political governmental divisions of the state are such corporations. These municipal corporations can only be created "for municipal purposes." The first section of the article now under consideration, gives the power to create such corporations "for municipal purposes." This excludes the power to create them for any other purpose. Should it be said that the power to create municipal corporations is contained in the general grant of legislative

power, or that it is contained in the third section, which makes it the duty, and confers upon the legislature the power to provide for the organization of cities and incorporated villages," then we reply, the provision that the legislature may create corporations for " municipal purposes," is a restriction upon the power of the legislature, given in general terms. Because, if not intended as a restriction, the language is useless, and means nothing. However, the legislative power is granted to create municipal corporations, we hold that when the same instrument which confers the power to create, also declares for what purposes the same may be created, that they cannot be created for any other purpose. What would be the use of declaring the purposes for which such corporations might be created, if they may also be created for purposes other than those specified ? When the purposes are mentioned, the language must limit the power of creation to the purposes specified. Had the intention been to leave the power unconfined, or not to limit, nothing would have been said about the purposes for which the corporations might be created.

Again, is there not a difference between creating a corporation and providing for the organization of such corporation ? It would seem so, from the fact (which cannot be successfully confuted,) that the legislature may, by direct language, say that certain persons named, or that certain described territory shall be a body corporate, from and after the taking effect of the act, This would not be an act providing for the organization of a corporate body. The body might never organize. The organization of a body corporate is getting into active form, or business-doing condition, by the election or appointment of officers, agents, &c. This would be an act. The law providing how this should be done, would be a law providing for such organization. The legislative act creating the corporation would be a different law. True, the law creating the corporation, and that providing for its organization, might both be in the same bill, and take effect at the same time. It is equally true, that they might be in different bills, and take effect at different periods of time.

Having come to the conclusion that the legislature have no power under the constitution to create municipal corporations, " except for municipal purposes," we will next consider what is meant by the words, " municipal purposes." That this language is used to designate something else than the ends,

objects and powers applicable to private corporations, is so obvious as to require no comment.

We understand that "municipal purposes" means the attainment of such local governmental ends, by the execution of local power, as may be necessary for and useful in the protection of the political and civil rights of the individuals composing the local body politic. If this is a correct construction, and if it be also true, that the legislature have no power to create "municipal corporations," except for the attainment of the ends already supposed, then it is clear that the legislature have no power to authorize municipal corporations to create debt or to collect taxes for the construction of works of internal improvement.

But, whatever may be the correct construction or interpretation of the words "for municipal purposes," it is clear that the legislature do not possess this power, if it be true that these words are used to *designate* powers, objects and ends, not applicable to private corporations. Because, being inapplicable to those private corporations, the language is restrictive upon the power, and *requires* that the legislature should create these municipal corporations solely for purposes other than the purposes for which railroad companies and other private corporations are or may be created.

Again, by sec. 3, Art. XI, before recited, the legislature are vested with the express power, and the duty enjoined, to restrict the power of taxation, assessment, borrowing money, contracting debts, and loaning credit, so as to prevent abuses in assessments and taxation, and in contracting debts by such municipal corporations."

If the legislature are bound to restrict and confine the power of these corporations, so as "to prevent abuses in assessments and taxation, and in contracting debts," it remains to be seen whether, under this legislative power, these corporations may be authorized to levy any amount of taxes, and to contract any amount of debt, regardless of objects or purposes. Is the giving power to do certain things, a restriction upon that power as to those certain things? If so, it would be restricting an incorporated village in the power of taxation by authorizing it to levy an annual tax of eight hundred millions of dollars. But would this be such a restriction as would "prevent an abuse" of taxation? This is the great question. All power to create debts, to levy taxes, to make assessments, &c., must be so restricted as "to prevent abuses" in relation

thereto, for the reason that the legislature have no power to authorize abuses.

The enumerated subjects for the exercise of municipal power, include everything which can involve taxation by such corporations. So that is clear that abuses in taxation must be prevented, though it be conceded that these corporations may be authorized to levy taxes for purposes other than those for which they may be created. Is it, or is it not, an abuse of taxation to tax the people of the town of Beloit two hundred and forty thousand dollars in twenty years, in addition to their proportion of state, county, and all town taxes for the support of the poor and town government? Or is the town of Beloit without the spirit of these provisions in relation to municipal corporations? If so, how stands the city of Beloit, within the town, and which was a village at the time of the passage of the act in question? If this city cannot now be compelled to pay these taxes because it involves an abuse of taxation, how could the town and village be compelled to do so? Can towns be authorized to create debts, and enforce taxation for railroad purposes, or for purposes other than those for which they were and may be created? Is our constitution thus partial and discriminative in favor of villages and cities, and against towns? Is an abuse of taxation a question of fact, of law, or compounded of law and fact, or a question, be its nature what it may, to be determined by the legislature? If to be determined by the legislature, is that determination final, exclusive and non-reviewable in the courts of the state? This cannot be, because the legislature is not the sole and exclusive judge of the measure of its power in this particular. To hold that it is such sole, exclusive judge, is to hold that it may authorize abuse in taxation; or that there cannot be any such thing as an abuse of this kind. The result of this inevitably is, that this language of the constitution means nothing. Because, with this language in the constitution, the power is the same as it would be were the language out of it. It is the business and duty of this court to construe and determine what the language in the constitution means. The court must therefore construe this language and pronounce its meaning. When the precise meaning is declared, it will be easy to determine whether there is an abuse in taxation, in any case that is presented, when there is no dispute as to the facts, or where the facts have been found by a court or jury. The question is therefore a judicial one, and not legislative.

In this case there is no dispute about the facts; and if there is not an abuse in taxation presented in the matter of amount alone, it will be somewhat difficult to state the amount that will present a case of such abuse. But independent of the question of amount, there is a direct abuse in the creation of a debt and imposing taxes, for purposes other than those for which municipal corporations may be created.

All the power of municipal corporations, in relation to taxation, assessment, borrowing money, contracting debts, and loaning their credit, when exercised, must be confined to the purposes for which they may be created; and for no other purpose can any of these powers be exercised. And as to matters where these powers may be exercised, the powers must be restricted to such an extent, that there shall be no abuse in taxes. This third section in .words only applies to " such municipal corporations" as are " incorporated villages and cities." If the spirit of this section does not include towns and counties, then it remains to be seen whether they can by any possibility be authorized to contract debts and enforce taxation to any extent, and for any purpose, without regard to the objects of their creation.

This presents two considerations: 1. Are towns and counties municipal corporations? 2. If they are such corporations, can the legislature authorize them to do any act foreign to or without the purposes for which they may be created?

As to the first proposition, we contend that towns and counties are municipal corporations. This court has decided that the taking of private property for a common highway, was not taking it for municipal purposes, which required the verdict of a jury, establishing the necessity of so doing before it could be done, within section 13, Art. I, of the constitution. It is obvious that this decision is correct, because a highway is for all the people of the state; and property taken therefor is taken for the use of the whole public. This being so, it cannot in any just sense be said that the property is taken for municipal purposes. This is not a decision determining what is and what is not a municipal corporation. This last was not necessary to a decision of the points raised in the case referred to. Burrill, in his Dictionary, defines a municipal corporation to be " a public corporation; a corporation created by government for political purposes, and having subordinate legislative powers, to be exercised for local purposes, such as a county, city, town, or village." Much the same

definition is given in 2 Kent's Commentaries, 275. Burrill, in defining the word " municipal," says, " belonging to a city, town, or place, having the right of local government; belonging to or affecting a particular state, or separate community; local; particular; independent." Nothing different is gleaned from Wilcox on Municipal Corporations. This author, speaking of these corporations in ancient times, page 10, Law Library, vol. 12, says: " The purposes, then, of municipal corporations, were the security of commercial associations, and the investing of the inhabitants with the power of governing themselves."

It is submitted, that no author or court has ever gone so far as to assert that " municipal purposes" can be construed to mean being a stockholder or member of any railroad company, or an aider in the construction of a railroad. If anything can be considered as settled law, it is the proposition that towns and counties are municipal corporations. These, by our constitution, can only be created for municipal purposes; that is, local government power; or, as we have before said, for the attainment of such governmental ends, by the execution of local power, as may be necessary for, and useful in the protection of the political and civil rights of the individuals composing the local body politic. It would be passing strange if it was intended by our constitution that the legislature should have power to confer upon these local governments, towns and counties, powers which were, by the same instrument, expressly prohibited to, or taken from the state, simply because the legislature are authorized to create the local public corporations, for purely municipal purposes. This cannot be maintained, as the state cannot engage in the construction of railroads, so towns and counties cannot. Such engagements, as we have already seen, are not municipal purposes, so that on that score, towns and counties cannot exercise the power to construct or aid in the construction of such works.

As to the second proposition; namely, whether the legislature can authorize municipal corporations to do any act foreign to or without the purposes for which they may be created, it will not be necessary to spend much time. It is quite obvious, that when a corporation can only be created for certain enumerated purposes, that its whole power must remain confined to the objects of its creation. To hold otherwise, is to maintain that a body may exercise a power wholly without

and contrary to the law of its being or creation. This would be flat absurdity. It may be proper to remark, that the framers of the constitution very likely confined their language, for the restricting the power of taxation, &c., to two species of municipal corporations, villages and cities, for the reason that they well know that these bodies in other states had been much in the habit of contracting heavy debts for purely municipal purposes, in consequence of which, many abuses in taxation had been committed. This was out of more abundant caution as to these bodies. We admit, that while keeping within these limits, abuses in taxation might be great. This being foreseen, the third section was inserted, requiring such restriction in the exercise of municipal powers, for municipal purposes, as would prevent abuses in taxation. Nothing in support of the act in question is to be obtained from this article of our constitution on corporations, nor from any other portion of the instrument.

It has been argued for the plaintiff, that if towns and counties cannot be authorized to become stockholders in railroad companies, and to obtain the money to pay for stock thus subscribed, that individual citizens of a state cannot be incorporated into a railway or canal company. If this were admitted, it would not affect the proposition that towns and counties cannot be incorporated into such companies. But the argument is not sound, for the reason that the legislature, by section one of Article XI. of the constitution, are expressly authorized to incorporate railroad companies. We maintain, however, that this power must be so exercised that no power to enforce taxation is given, or so that no taxation shall result from any thing done by such company, or by any stockholder, or member thereof. The legislature may authorize the construction of any number of railroads or canals that it may think ought to be constructed; but these must all be constructed without taxation. And the legislature must so exercise their powers in regard to corporations for the construction of works of internal improvement as to avoid the imposition of taxes therefor.

When these works can be constructed without resort to taxation, there is no objection to be urged. But the constitution protects every person from the payment of taxes for such purposes. No person is required to yield obedience to any enactment which declares that he shall pay taxes, or money, for such purposes, or that he shall be a member of a cor-

poration created for the construction of such works, or that he shall assist in the construction of a railroad or canal. It is not necessary for the legislature to pass an act to enable or authorize an individual to become a member or stockholder in a railway company. He can do this of his own, and not of legislative will. Not so with a town, county, or state. Here positive enactment is necessary. So that the difference between incorporating individuals, and towns, and counties, into a railway corporation, is remarkably plain. To hold that the legislature can incorporate the towns, villages, cities, and counties of the state into a railway corporation, and empower them to obtain the money to construct railways by taxation, when the state is prohibited from engaging in such works, is to maintain an absurdity. If towns and counties cannot be incorporated into railway companies, how can any of them be authorized to become member or stockholders of such companies? Are not these companies made up of stockholders? And can there be such company without stockholders? It seemeth not.

On the second proposition the act in question must then be pronounced unconstitutional and void. In no point of view can this enactment be sustained without violating the spirit of at least two provisions of the constitution. The bond in question is of consequence void, and the plaintiff must fail in his action, and the judgment of the circuit court should be reversed.

*M. H. Carpenter*, for the respondent.

*By the Court*, COLE, J. This action was brought to recover interest on coupons attached to town bonds issued by the appellant in 1853, for the purpose of aiding the construction of the Racine and Mississippi railroad. The bonds were issued under an act of the legislature, authorizing the board of supervisors of the town, to subscribe one hundred thousand dollars to the capital stock of a railroad company, authorized to construct a railroad from the city of Racine to the village of Beloit, and to pay for such subscription in the bonds of the town, payable in twenty years, with inter-

est payable annually, in the city of New York, not exceeding seven per cent. per annum. The law provided that no bonds should be issued until a majority of the legal voters of the towns, voting upon the question, should vote in favor of the subscription, at a special election, called and held for that purpose. From the record it appears that an election was held, and that three hundred and twenty-one ballots, out of three hundred and eighty-eight cast upon the question, were in favor of the subscription. The supervisors issued the bonds, and delivered them to the company, receiving therefor, an equal amount of the capital stock of the company. The bonds, by their terms, were made transferrable by general or special endorsement, or by delivery, the same as a note of hand, payable to bearer. The respondent bought the bonds and coupons sued upon, for value, and without any actual notice of any of the matters of defense set up by the town in its answer. The payment of the interest due upon these bonds is now resisted by the town on various grounds.

But the fundamental question raised and discussed in the case, is in regard to the power of the town to subscribe for stock in, and to loan their credit to railroad companies, even when authorized by an act of the legislature so to do. Unless expressly authorized by the legislature to make the subscription, it is not contended that any could have been made in behalf of the town. But having been authorized by an act of the legislature, it must be admitted, that upon the authorities, the subscription made in conformity to the provisions of the act is valid, unless the law is unconstitutional. It is true, some objections were taken to this legislation, based upon general principles of law and sound policy, aside from the prohibitions of our constitution. It is said to be entirely foreign to the object and purpose of a town or municipal corporation to subscribe stock to aid in constructing railroads, or to carry on works of internal improvement of this

nature. And it is insisted, not without force of reasoning, that town and municipal corporations exist, or are created for no such purpose, and that it is an entire perversion of the powers of such corporations to permit them to do so. But this field of discussion has frequently been gone over in the adjudged cases, and the whole argument has been thoroughly exhausted. In most of the cases found in the reports of the different states of the Union, laws authorizing towns, cities, and villages to subscribe stock for railroad companies, and incur indebtedness for making certain internal improvements, have been sustained, and declared valid, unless they were in conflict with some provision of the state constitution. The cases upon this subject will be found, most of them, in the notes to pages 108 to 125, inclusive, of Pierce on American Railroad Law.

The precedents for this kind of legislation are so numerous; the sanction which it has received from the executive, legislative, and judicial departments of the government, in other states, is so uniform; the rights and interests vested on the faith of it, are so important, when considered in connection with the fact that the laws were to have no effect, unless with the assent of the people directly affected by them; and after the subject was fully discussed by the press, and in public meetings, the people directly interested, voted in favor of these subscriptions, thereby authorizing their corporate authorities to make them; and also when it is borne in mind, that great amounts of capital have been invested in the bonds of towns, counties, and cities, thus issued, by innocent *bona fide* holders; when all these considerations are regarded, it seems rather late to raise the objection that this policy has been all wrong from the beginning; that the legislation, by which the present condition of things has been brought about, is not wise and wholesome, but evil and pernicious, and must now be repudiated' altogether.

As a matter of course, if this species of legislation is forbidden by the constitution, or comes fairly within the intent and meaning of any of its prohibitions, it must fall whatever may be the consequences to the honor and character of our people, or however great may be the loss to those whose means have been honestly invested in this class of securities.

But, unless the constitution does restrain the legislature from conferring upon towns, counties and cities the authority to make subscriptions to the capital stock of companies incorporated to construct rail roads, in which they are interested, it is the plain manifest duty of the courts to sanction this kind of legislation. Considerations in respect to its wisdom and sound policy must be addressed to another forum. These general observations were deemed not inappropriate as an answer to some remarks made by counsel in the argument of the present case, and that of *Clark et al. vs. The City of Janesville*, which involves substantially the same questions under the constitution.

I will now proceed to notice the various provisions of the constitution which are relied upon to show that all acts of the legislature authorizing towns, counties and cities to subscribe to the capital stock of railroad companies, and issue bonds for such subscriptions, are unconstitutional and void. The two following provisions may be conveniently considered together.

Section 3 of Art. VIII. reads as follows : " The credit of the state shall never be given or loaned in aid of any individual, association, or corporation." And, section 10 of the same article : " The state shall never contract any debt for works of internal improvement, or be a party in carrying on such works." It is difficult to perceive how these provisions can fairly be said to apply to anything but the state in its political capacity as such. The whole article appears to be

designed to regulate the finances of the state proper. This is the fair reasonable and consistent construction to be placed upon its provisions. If it was intended to regulate the finances of the towns, counties and cities, and to restrain them from loaning their credit in aid of any corporation, or to inhibit them from contracting debts for works of internal improvement, or from being a party to carrying them on, the language was most unfortunately chosen to convey that intention. The leading idea is, and this corresponds precisely to the fact, that the state; as a body politic or political organization, independent of and distinct from its constituent parts, would have its treasury, its money, its credit and its debts; and that the power of the legislature over these things, which would otherwise have been unlimited, should be restricted and exercised in a certain manner. Hence, in the second section it says, " no money shall be paid out of the treasury, except in pursuance of an appropriation by law." To what does this refer ? What does it mean ? Does it mean that no money shall be paid out of the treasuries of the different towns, counties and cities in the state without an appropriation made by the legislature? This construction is too absurd to be seriously insisted upon. And yet, if the 3d and 4th and 10th sections of this article, which speak of " *the state*," " the credit of the state," the " public debt of the *state*," and that " the state shall not contract a debt for works of internal improvement," if these sections can be held to apply to towns, counties and cities, why may it not be claimed with equal reason that the other sections of the article apply to the towns, counties and cities as well as the state?

The town of Beloit, or the city of Janesville, might give or loan its credit in aid of a corporation, without the credit of the state becoming pledged in any way thereby. Such indebtedness would be the indebtedness of the town or the city, not the indebtedness of the state. It might with the

same propriety be said that the indebtedness of the state of
Wisconsin was the indebtedness of the United States, as to
say that the indebtedness of the town of Beloit is the indebt-
edness of the state of Wisconsin. Why then is it claimed
that because the constitution forbids that the credit of the
state shall be given or loaned in aid of any corporation, that
by the force of this language the town of Beloit is forbidden
to loan its credit in aid of any corporation? Such construc-
tion is doing violence to all language and all known rules of
interpretation. And, to my mind, it is equally clear that
though the state, in its political capacity as such, is prohibit-
ed from contracting any debt for works of internal improve-
ment, and from becoming a party to carrying them on; yet,
this prohibition does not apply to the political subdivisions of
the state, the towns, counties and cities, which, when proper-
ly authorized, may contract such indebtedness and become a
party to such improvements. At all events, the natural and
rational construction of these restrictive clauses is that they
apply to the state in contradistinction to the subdivisions of
the state. Otherwise, how would it be possible for our cities
and villages to improve their harbors; to pave and grade their
streets; to build their bridges; or to do many other things
calculated to increase their trade and property, and promote
the comfort and welfare of the citizens? This construction
derives additional force from a reference to the mischiefs and
evils which these prohibitions in the constitution were intend-
ed to guard against and prevent. It is well known to every
person of common information in respect to the history of
this country that at the time our constitution was adopted
many of the neighboring states had become almost hopeless-
ly involved in debt, by attempting to carry forward and sus-
tain a general system of internal improvements. The credit
of some of the states was ruined, and public confidence in all
greatly impaired.

It was notorious that these works always cost the state more than they did individuals and private corporations, and were operated at much greater expense. Besides, no system could be devised which would operate alike over the whole state. If the money to carry on internal improvements was raised by general taxation, and there was no other way to raise it, the burdens would fall upon all, while the benefits would enure to a comparatively small portion of the state. And to save the state from the bankruptcy and ruin which had followed in other states in consequence of their embarking in a general system of internal *improvements*, and to avoid the unequal taxation inseparable from that policy, the framers of the constitution wisely provided that the state should neither loan its credit to any corporation or be a party to carrying on such works. It was thought best to leave their construction to private enterprise and associated capital, rather than that the state should have anything to do with them. It was not supposed that towns and counties whose inhabitants were mostly farmers, or that even cities would involve themselves in debt for these works. Probably, if the country had then had the experience of the last ten years, and seen the distress and financial ruin which towns, counties and cities have brought upon themselves by subscribing to the capital stock of rail road companies, and issuing their bonds therefor, a provision would have been incorporated in the constitution to prevent the evil. But this was not done; and we cannot construe the constitution as though such a prohibition was there. The prohibitions therein incorporated apply to the state, but do not reach subscriptions of the character in question. See *Cass vs. Dillon*, 2 Ohio St., 607.

But it was further contended, in behalf of the town, that if the state itself was prohibited from loaning its credit in aid of a corporation, or from building railroads, or of becoming

Bushnell vs. Beloit.

a party thereto, that it cannot authorize a town or city to do so. The argument in brief is, that a state cannot authorize one of its political divisions to do what it cannot itself do. A slight examination will show that this position is unsound.

We suppose it to be a well settled political principle that the constitution of the state is to be regarded not as a grant of power, but rather as a limitation upon the powers of the legislature, and that it is competent for the legislature to exercise all legislative power not forbidden by the constitution or delegated to the general government, or prohibited by the constitution of the United States. The legislature, subject to a qualified veto of the executive, possesses all the legislative power of the state. If there is nothing in the constitution forbidding it, why was it not competent for the legislature to authorize towns and municipal corporations to subscribe stock for rail roads. But a sufficient answer was given to this argument by the counsel who sustain the validity of these bonds, by saying that if the proposition was sound that the state could not authorize a municipal corporation or town to do what itself could not do, that the argument proved too much, and therefore must be rejected. It would go to the extent of denying that the legislature could create corporations to build rail roads, plank roads, gas works, and for doing many other things which the state cannot do. These corporations have been created since the organization of the state government; various works of internal improvement have been carried on by them; they have exercised the right of eminent domain in the prosecution of their enterprises, and the constitutionality of this legislation has not been questioned.

It is very true that in some of the cases sustaining the constitutionality of laws authorizing towns and municipal corporations to subscribe for stock to rail road companies, it is

said that as the state could carry on these works, or aid in carrying them on, therefore it could authorize the local authorities to do what it refuses to do itself. *Clark vs. The City of Rochester*, 24 Barb., 447; *Sharpless vs. The Mayor o Philadelphia*, 21 Penn. St., 147. But it seems to me that the true reason is that when the legislature is authorized to create municipal corporations, and no limit is imposed by the constitution as to the power which shall be conferred upon them, that then the extent of such powers rests in the discretion of the legislature. Of course the legislature could not authorize any corporation to violate directly or indirectly any provision of the constitution. But when the constitution does not prohibit the legislature from conferring the power upon cities and towns to take stock in railroad companies, or to loan their credit in aid of such works, I cannot understand why that power may not be granted to them as well as many others which they exercise. The state could not construct water works for, or pave and grade the streets in the city of Janesville; but does any one doubt that the legislature might authorize the corporate authorities to contract a debt for making these improvements? *The City of Aurora vs. West*, 9 Ia., 74.

Another objection taken to the constitutionality of this legislation may be disposed of in this connection. It is said that subscribing stock and issuing bonds for building railroads, is no legitimate part of the authority of a city or a town, and certainly foreign to the purpose for which they are created. Sections 1 and 3, of article IX, are relied upon to sustain this position. It is evident that section one was intended to regulate the manner in which corporations should be created by the legislature. It provides that " corporations, without banking powers or privileges, may be formed under general laws, but shall not be created by special act, except for municipal purposes, and in cases where, in the judgment

of the legislature, the object of the corporation cannot be attained under general laws." But this section does not limit the power which the legislature may confer upon a corporation. It declares that they shall be created only by general laws, except when it is a municipal corporation; then it may be created by special act. The plain, obvious intent of the section is, to prevent the evils and mischiefs of special legislation; and its object was not to restrict the legislature from conferring plenary powers upon municipal corporations.

It was further objected, that towns, cities and counties are organized and created strictly for governmental or police purposes, and that the building of railroads, and embarking in a system of internal improvements, on account of some benefits which may accrue from such works, to the citizens, is foreign to the objects, and a perversion of the powers of these corporations. I have already alluded to this objection, and I do not propose to discuss the proposition more. That it is competent for the legislature, in the absence of constitutional restrictions, to confer upon towns and cities the power to subscribe stock for railroads, has been generally affirmed by the courts where the question has arisen. I could add nothing to the reasoning of these cases, were I to enter upon the discussion of the question involved. The subject is very ably discussed in the decisions to which I have referred, and I am content to rest the question upon those authorities, providing our constitution does not render them inapplicable.

I cannot perceive that section 3, of article XI, can possibly have any application to this case. That section makes it the duty of the legislature "to provide for the organization of cities and incorporated villages, and to restrict their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent abuses" of the same. The town of Beloit is not one of those corporations embraced within this section, as in effect, was decided in the case of

Bushnell vs. Beloit.

*Peck vs. Norton*, 3 Wis., 714. Were this otherwise, and could it be assumed that the appellant fairly came within this provision of the constitution, the section itself would furnish the strongest argument which could be adduced, in favor of the validity of the bond, since it is a clear recognition that the corporations therein named may be clothed with this power to "borrow money," "contract debts," and "loan their credit." And for what purpose do these corporations borrow money, and loan their credit? Not certainly to defray the ordinary expenses of the local government. It is only to enable them to engage in such public improvements as are deemed necessary to develop the resources of the tributary country, and increase the business, commerce and traffic of the respective localities. And the simple fact, that it was made the duty of the legislature to restrict the power of corporations in loaning their credit and borrowing money, is the strongest implication that such a power was supposed to exist, and that it would require regulation; for certainly it would not be pretended that the legislature could restrict the exercise of a power which did not exist. But it is unnecessary to dwell upon this clause of the constitution. It in express language applies only to cities and incorporated villages; and therefore the town of Beloit cannot be considered within it.

There remains to be noticed one or two clauses of article VIII, which, it is claimed, have some bearing upon the law in question. And I will merely say, in reference to the 4th and 8th clauses of that article, that like the 3d and 10th, they appear to me to relate to the state, and to a state indebtedness, or to a law directly imposing a tax, and not to one authorizing a town to subscribe stock, if the people of such town shall vote to do so. The remarks which have already been made upon the other clauses of that article, apply to the ones now being considered. This law authorizing the super-

visors of the town of Beloit to make the subscription, providing a majority of the people should vote in favor of it, did not create a state indebtedness, or impose such a tax as was contemplated by the eighth clause of this article. And the conclusion at which I have arrived upon the subject is, that the constitution of this state neither expressly, nor by any fair implication, prohibits the legislature from granting the power to towns and municipal corporations to subscribe stock for the construction of railroads in which they are interested, and to issue bonds therefor.

A few subordinate points remain to be noticed. It was objected that the railroad company had no power to exchange its stock for bonds of the town of Beloit. But the act authorizing the town to subscribe the stock, was a sufficient authority to the company to receive the subscription. What legislation was necessary to authorize the company to receive a subscription, which the town has ample power to make ?

Again, it was objected, that the supervisors had no authority to make the subscription, and issue the bonds, on account of some alleged omission to comply with the provisions of chapter 12, Pr. Laws, 1853, in giving notice of the election, and canvassing the votes, &c. I am unable to discover any defect in the notice, or any such irregularity in conducting the election, or ascertaining the result, as should in any wise affect the validity of the bonds in the hands of the respondent. Indeed, the election appears to have been legally conducted; and the circumstance that the inspectors, when they canvassed the votes, stated the result in figures, instead of writing the numbers out in full, ought not to affect the validity of these securities. If irregularities in the election in fact existed, or if the notice was defective, the case of *The Commissioners of Knox County, Indiana, vs. Aspinwall et al.*, 21 How., U. S. R., 539, is an authority in point to show that such matters would not constitute a good defence in this action.

It was further objected, that the authorities of the town had no power, under the act of the legislature, to make the bonds negotiable, like commercial paper. But the authority to issue the bonds carried with it the incidental power to issue them in that form, and to give them that character usually belonging to this class of securities. Such securities are ordinarily transferable, and are more readily disposed of in market on that account. I think the supervisors had ample power to issue the bonds in the manner they did.

Upon the finding of the circuit court, I have no doubt but the judgment of that court is right, and must be affirmed.

