Argued July 28, decided October 12, on motion for rehearing and to issue mandate denied December 21, 1909.

## STATE v. COCHRAN.

[104 Pac. 419; 105 Pac. 884.]

INTOXICATING LIQUORS—LOCAL OPTION LAW—REPEAL BY CITY CHARTER —"RESTRAIN"—"REGULATE."

1. St. Johns City Charter (Sp. Laws 1905, p. 542), § 69, subd. 45, authorizing the council to regulate and restrain dealers in liquor, places where it is kept for sale, and the sale and disposal thereof, and providing that no provisions of the law concerning the sale or disposition of liquors in Multnomah County shall apply to the sale or disposition thereof in said city, repeals the local option law (Laws 1905, p. 41) as to such city; the word "restrain" being more comprehensive than, and including the power to, prohibit, and the power to license being included in the word "regulate."

INTOXICATING LIQUORS—LOCAL OPTION—CITY CHARTERS.

2. St Johns City Charter (Sp. Laws 1905, p. 542) § 69, subd. 45, authorizing the council to regulate and restrain the sale of intoxicating liquor, and exempting the city from the operation of any law that concerns "the sale or disposition" of intoxicants, is not a mere retention of the provision of the city's 1903 charter (Sp. L. 1903, p. 660, § 18, subd. 13), authorizing its council to license, regulate, and restrain barrooms, and exempting all its citizens from any county license which may be imposed by general law of the state, and so does not leave the city subject to the local option law. (Laws 1905, p. 41.)

INTOXICATING LIQUORS—LOCAL OPTION—CITY CHARTERS.

3. The city of St. Johns being exempt from the local option law (Laws 1905, p. 41) under its charter of 1905 (Sp. Laws 1905, p. 542) § 69, subd. 45), is left so by the initiative charter of 1907 a reincorporation of the city, and largely a repetition of the provisions of the charter of 1905, leaving the effect of the subdivision in question unchanged, and not being a new statement of law, or an effort by the people to exempt the city from the operation of the local option law, which it had no power to do.

INTOXICATING LIQUORS—LOCAL OPTION—CITY CHARTERS.

4. The statement in St. Johns City Charter (Sp. Laws 1905, p. 542, § 69, subd. 45), that "no provisions of the law concerning the sale or disposition of any * * * liquors in Multnomah County shall apply to the sale or disposition thereof in the city," is not intended to be limited to the gallon law; the gallon law applying with equal effect to every other county, and all incorporated cities being expressly excepted from its operation, while the local option law (Laws 1905, p. 41), concerning only the "sale or disposition" of intoxicants till excepted by subsequent legislation, applies to every county and municipality.

COURTS—SUPREME COURT—JURISDICTION—QUESTION OF CONSTITUTIONALITY OF OFFICE OF SUPREME JUDGE.

5. The Supreme Court will take jurisdiction of a collateral attack on the constitutionality of the offices of certain of its members.

CONSTITUTIONAL LAW—CONSTRUCTION OF CONSTITUTION—OBJECT AND PURPOSE.

6. In construing the constitution, its object and purpose must be considered, and it must not be interpreted on narrow or technical principles, but on broad general lines, that it may accomplish the object intended, and the presumption and legal intendment is that each and every word, clause, and sentence in a written constitution has been inserted for some useful purpose, so that it must be construed as a whole.

CONSTITUTIONAL LAW — CONSTRUCTION OF CONSTITUTION — TWO CONSTRUCTIONS.

7. Where two constructions of a constitution are possible, one of which raises a conflict or takes away the meaning of a section, sentence, phrase, or word, and the other does not, the latter construction must be adopted, or the interpretation which harmonizes the constitution as a whole must prevail.

CONSTITUTIONAL LAW—NATURE OF STATE CONSTITUTION.

8. A state constitution, unlike a federal constitution, is one of limitation and not a grant of powers, and any act adopted by the legislature not prohibited by the state constitution is valid, and the inhibition must expressly or impliedly be made to appear beyond a reasonable doubt.

COURTS—SUPREME COURTS—INCREASE OF JUDGES—CONSTITUTIONAL PROVISIONS.

9. Bill of Rights, Section 10 ,declares that justice shall be administered openly and without purchase, completely and without delay, and that every man shall have remedy by due course of law, etc., to the end, as the preamble declares, that justice be established, order maintained, and liberty perpetuated. Constitution, Article VII, Section 1, provides that the judicial power of the state shall be vested in the supreme court,

circuit courts, and county courts. Section 2 provides that a supreme court shall consist of four judges, to be chosen in districts by the electors thereof, and that the number of districts may be increased, but shall not exceed five until the white population of the state shall amount to 100,000, and shall never exceed seven. Section 10 provides that, when the white population amounts to 200,000, the legislative assembly may provide for the election of supreme and circuit judges in distinct classes, one of which classes shall consist of three judges of the supreme court, who shall not perform circuit duty, and the other class shall consist of the necessary number of circuit judges, etc. *Held,* that in view of the rule that a state constitution is a limitation and not a grant of power, and that prohibitions must be strictly stated, and in view of the fact that Section 10, Bill of Rights, would ultimately require more than five circuit and three supreme judges to dispense justice, if such a number were required by a population of 200,000, Article VII, Section 10, must be deemed to provide that, when the state should reach the population requiring a separation into distinct classes, the number of supreme judges should begin with three and no less, leaving the additional number to be determined under the future conditions as they might arise.

COURTS—SUPREME COURT—INCREASE OF JUDGES—CONSTITUTIONAL PROVISIONS.

10. A determination that the State had reached that stage of advancement where more members of the Supreme Court had become essential to the carrying out of the purposes of the constitution as expressed in its preamble, and in Section 10, Bill of Rights, resting with the legislative assembly only, Laws 1909, p. 99, c. 50, declaring such an emergency, and increasing the number of judges from three to five, was constitutional.

CONSTITUTIONAL LAW—STATUTES—LEGISLATIVE POWER.

11. Courts will never exercise the extraordinary power of declaring an act of the legislature unconstitutional, unless there is a plain, palpable and clear conflict between the statute and the constitution. Every doubt must be resolved in favor of the legislative act.

From Multnomah: ROBERT G. MORROW, Judge.

The defendant, Sam Cochran, was tried and convicted for the violation of the local option law in the City of St. Johns and from the judgment following such conviction, defendant appeals.                              REVERSED.

For appellant there was a brief with an oral argument by *Mr. Thomas O'Day.*

For the State there was a brief over the names of *Mr. George J. Cameron,* District Attorney, *Mr. Joseph H. Page,* Deputy District Attorney, and *Mr. A. King Wilson,* with oral arguments by *Mr. Page* and *Mr. Wilson.*

MR. JUSTICE KING delivered the opinion of the court.

MR. JUSTICE EAKIN and MR. CHIEF JUSTICE MOORE dissent.

1. Defendant was informed against, tried, and convicted in the circuit court for violating what is known as the local option law (Laws 1905, p. 41), in precinct No. 91 in the city of St. Johns. The council of that city, acting upon the advice of the city attorney to the effect that the local option law did not apply to that locality, adopted an ordinance permitting the sale of intoxicating liquors upon the payment of a license fee of $1,200 per annum. Defendant, after paying the required license fee, was given a license to sell spirituous, malt, and vinous liquors, and was operating under it at the time of making the sale of liquor for which he was convicted.

St. Johns was first incorporated by an act of the legislative assembly on February 19, 1903. By Section 18, subd. 13 thereof, the council was given power and authority "to license, tax, regulate, and restrain, suppress and prohibit * * barrooms, groceries, tippling houses; * * and all citizens within the corporate limits shall be exempt from any county license which is or may hereafter be imposed by the general laws of the State. * *". The local option law authorizing the voters in any county or subdivision thereof within the State to determine whether the sale of intoxicating liquors shall be prohibited in such county or subdivision was initiated and adopted by the vote of the people of the State on June 6, 1904, and took effect June 24, 1904. Laws 1905, p. 41. On January 20, 1905, the legislature granted the city of St. Johns a new charter by an act entitled "An act to incorporate the city of St. Johns, Multnomah County, State of Oregon, and to provide a charter therefor and to repeal all acts or parts of acts in conflict therewith." Special Session Laws 1905, p. 519. By Section 69, subd. 45, thereof, the council is granted the power and authority "to regulate and restrain bartenders, saloon keepers, dealers in and manufacturers of spirituous, vinous, fermented or malt liquors, barrooms, drinking shops, or places where spirituous,

vinous, or malt liquors are kept for sale, or in any manner disposed of, and the sale and disposal thereof. * *". The charter of 1905 also contains a provision, not found in the former charters, that "no provisions of the law concerning the sale or disposition of any spirituous, vinous, fermented, or malt liquors in Multnomah County, shall apply to the sale or disposition of the same in the city of St. Johns. * *". On June 4, 1906, the people of the State of Oregon by the initiative adopted an amendment to Article XI, Section 2, of the constitution, which took effect June 25th following, and reads as follows:

"Corporations may be formed under general laws, but shall not be created by the legislative assembly by special laws. The legislative assembly shall not enact, amend, or repeal any charter, or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the constitution and criminal laws of the State of Oregon."

In the year 1907 the people of the city of St. Johns, by the initiative, adopted "an act to incorporate the city of St. Johns, Multnomah County, Oregon, to provide a charter therefor, and to repeal all acts or parts of acts in conflict therewith." Section 68, subd. 45, of this charter, is a copy of Section 69, subd. 45, of the charter of 1905, with the addition of the word "license" immediately following the first word "to." At the general election on June 1, 1908, by a vote of the people in the precinct mentioned, prohibition was adopted under the provisions of the general act on the subject.

Defendant maintains there is no difference in effect between the provisions of the charter of St. Johns and that of the city of Medford, so far as applies to the sale of intoxicants, by reason of which it is insisted that the conclusion announced by this court in *Hall* v. *Dunn,* 52 Or. 475 (97 Pac. 811) is decisive of this case; while plaintiff's principal reliance for affirmance is upon the decision

Sig. 6

in the case of *State ex rel.* v. *Malheur County,* 54 Or. 255
(101 Pac. 907) with reference to which it is insisted that
the charter of Vale and the one under consideration on
the point in question are substantially the same. The
question as to the effect of the adoption of the charter
after the enactment of the local option law, and whether
a special act repeals a general act in such cases, as well as
some of the other legal points involved herein, are so thor-
oughly and exhaustively considered and determined in
the case of *Hall* v. *Dunn,* 52 Or. 475 (97 Pac. 811: 25
L. R. A. (N. S.) 193), that any further elucidation there-
of at this time would be fruitless. It is only necessary
here to ascertain whether the provisions of the charter
under consideration come within the legal principles
there enunciated. The language contained in the charter
of Medford (Special Laws 1905, p. 989, *et seq.*), the effect
of which was determined in that case, we think is to the
same effect as that of the charter under consideration.
But it is suggested in this connection that there is a dis-
tinction between the two charters, in that the Medford
charter provides that the council may "license, tax, regu-
late, or prohibit," etc., while the St. Johns charter uses
the words "to regulate and restrain" the sale or disposi-
tion of spirituous liquors, etc., and that no law concern-
ing the sale or disposition thereof shall apply to that city;
or, in other words, that the legal effect of "prohibit" dif-
fers from "restrain." There is a slight distinction
between the two words, but such as there is, if it has
any bearing on the case at hand, has the opposite effect
to that claimed for it, for, if there is any difference
between them, the word "restrain" is the more general
and comprehensive term, as it necessarily includes not
only the right to regulate, but to "prohibit" as well, while
the converse is not essentially true. However, the words
are usually treated as synonymous. See March's The-
saurus; Soule's Synonymes. The Century Dictionary in

defining the word "restrain" among other interpretations holds it to be "to forbid; to prohibit"; and the Standard Dictionary defines it to be: "to enjoin; to restrict; to prohibit." Judge Grosscup *in re* Charge to Grand Jury (D. C.) 62 Fed. 828, 831, defines the word thus:

"To restrain is to prohibit, limit, confine, or abridge a thing. The restraint may be permanent or temporary. It may be intended to prohibit, limit, or abridge for all time, or for a day only. The law draws no distinction in this respect."

To the same effect: *Smith* v. *Town of Warrior,* 99 Ala. 481 (12 South. 418); *Vinson* v. *Town of Monticello,* 118 Ind. 103 (19 N. E. 734.) One of the statements in *Portland* v. *Schmidt,* 13 Or. 17, 22 (6 Pac. 221), tends to the contrary, but the court there only had under consideration the validity of a license ordinance, and the powers enumerated related solely to the regulation of barrooms and drinking shops. The opinion there injected relative to the limitation to be placed upon the word "restrain" is not only mere dicta, but is in conflict with the great weight of authority, and is not supported by any authoritative lexicographer.

But, assuming that the word "restrain" does not go to the extent stated, this variance from the language used in the Medford charter could not affect the result. The Medford charter adds the power "to license," but in the charter under consideration, this power is included in the word "regulate." *Chicago Packing Co.* v. *Chicago* 88 Ill. 221, 226 (30 Am. Rep. 545.) And the power to license is irreconcilable with the local option law, and, when construed with a provision to the effect that no general law respecting sales of intoxicants shall apply to the municipality in which such power is granted, must necessarily take such locality out of the operation of the act. The two laws cannot operate in the same place at the same time, for one permits and the other prohibits, sales for beverage purposes. Again the effect of the word "pro-

hibit"—omitted in the St. Johns charter—could only become material in the event we were confronted with the query as to whether in the absence of the local option law, or the application thereof, the city would have the power to prohibit the sale of intoxicants. No attempt is made by the city to prohibit such sale, but, on the other hand, it has issued a license permitting the sale thereof. Under the charter as it stands, in the light of clear and express declaration to the effect that the municipality shall be excepted from the operation of any other law relating to the sale of liquors, and it having been given the right to license and restrain the sale of intoxicants, there is no possible reconciliation of these provisions with the local option law, which, when coupled with the result announced by a vote of the people in precinct No. 91, declares that it shall not have that power, in reference to which Mr. Justice MOORE, speaking for this court, in *Hall* v. *Dunn,* 52 Or. 475 (97 Pac. 811, 816: 25 L. R. A. (N. S.) 193), announces the rule to be: "If it be asserted, however, that the abrogation is not express, the provisions of the local option law and of the amended charter are so repugnant in the respects mentioned that both measures cannot be enforced in the city of Medford, and for that reason the earlier statute is impliedly repealed by the later enactment: *Fleischner* v. *Chadwick,* 5 Or. 152, 155; *Stingle* v. *Nevel,* 9 Or. 62, 63; *Strickland* v. *Geide,* 31 Or. 373, 376 (49 Pac. 982). Though a general statute will not impliedly repeal a special law previously enacted (*State* v. *Sturgess,* 10 Or. 58, 62), the rule is well settled that, if the special statute is the later enactment, it necessarily operates to circumscribe the effect of the prior general act from which it differs: 26 Am. & Eng. Enc. Law (2 ed.) 743; Lewis Sutherland, Stat. Const. (2 ed) § 275. Thus, where a general local option law had by a majority vote been made applicable to a specified territory, of which a city formed a part, a subsequent amend-

ment of the municipal charter, authorizing the council to license the sale of intoxicating liquors, impliedly repealed the prior local option law, so far as the city was concerned: *Tabor* v. *Lander,* 94 Ky. 237 (21 S. W. 1056: 15 Ky. Law Rep. 8). To the same effect, see also, 23 Cyc. 104."

2. It is insisted by counsel for the State that the language of the St. Johns charter of 1905 (Special Laws 1905, p. 542), retains the provisions of Section 18, subd. 13, of the original charter (Laws 1903, p. 660), which reads, "All citizens within the corporate limits shall be exempt from any county license which is or may hereafter be imposed by the general laws of the State," and is within the ruling of *Renshaw* v. *Lane County,* 49 Or. 526 (89 Pac. 147), to the effect that this subdivision of the 1905 charter is not a new enactment, but merely the retention of the earlier provision, which remains unaffected by the new charter, and is subject to the local option law. The fallacy in this position lies in the inaccuracy of the premises assumed. It will be observed that this clause in the first charter merely exempts the citizens of St. Johns from the necessity of procuring any other license than from the city, while the 1905 charter exempts the city from the operation of any law that concerns "the sale or disposition" of intoxicants, thereby indicating that it meant something more than is contained in the language of the former charter. The Vale charter (Special Laws 1905, p. 136), contains no exemption from the operation of any State law, in which respect it is distinguishable from the one under consideration. It simply grants the power to "license, tax, regulate, or prohibit," etc., and contains no declaration indicating an intent to take the provisions on the subject out of the operation of the local option law, and without such manifest intention no municipality can be held exempt therefrom, from which it follows that the holding in that case can have no bearing

upon the one under consideration in which the intent to repeal is clearly apparent.

3. The initiative charter adopted in 1907, is a re-incorporation of the city, and largely a repetition of the provisions of the charter of 1905, leaving the effect of the subdivision now in question unchanged and unaffected by the re-enactment, and not a new statement of law: *Allison* v. *Hatton,* 46 Or. 370 (80 Pac. 101) ; *Renshaw* v. *Lane County,* 49 Or. 526 (89 Pac. 147.) It was not an effort by the people of the municipality to exempt the city from the operation of the local option law, which they have no power to do, but leaves the conditions relative thereto as they were prior to the adoption of the new charter, and, the city being exempt from the operation of the local option law by the terms of the charter of 1905, the re-enactment amounted merely to an attempted recognition of that fact, clearly indicating that the repealing cause was not intended to apply to that section.

4. It is also argued that the statement in the charter to the effect that no provisions of the law concerning the sale or disposition of any spirituous, vinous, fermented, or malt liquors in Multnimoh County shall apply to the sale or disposition of the same in St. Johns was only intended to apply to the gallon law. This contention overlooks the fact that what was known as the "gallon law" applies with equal effect to every other county, and that practically all incorporated cities are excepted from its operation. The local option law until excepted by subsequent legislation, like that under consideration, applies to every county and municipality in the State, and as does the Medford charter. The local option law concerns only the "sale or disposition" of spirituous liquors, and, as stated, is clearly within the St. Johns charter exemption on the subject.

It was contended with much force at the oral argument that since under the holding in *Baxter* v. *State,* 49 Or. 353

(88 Pac. 677 : 89 Pac. 369), the local option act, so far as it provides for penalties for violation thereof, is a general criminal statute, the people have no power to exempt the city from its provisions, as to do so would be in violation of the provisions of Article IV, Section 23, subd. 2, of the constitution of this State, and that, in addition thereto, to so hold would render the law unconstitutional because in violation of Article I, Section 20 of the constitution, providing that no law shall be passed granting to any citizen or class of citizens privileges or immunities which upon the same terms shall not apply equally to all citizens. Were these questions before this court for the first time, there might be room for discussion upon the subject, but the conclusion announced in *Hall* v. *Dunn,* 52 Or. 475 (97 Pac. 811 : 25 L. R. A. (N. S.) 193), and other cases bearing on the question, necessarily disposes of these questions adversely to the State's contention. It might be well to observe, however, that, if this position were tenable, its logical sequence would be that, since in only a part of the State has the local option law been made effective so far as prohibiting the sale of intoxicants is concerned, the general law itself, which enables the people by their votes to make an act a crime in one precinct, district, or county, which may be lawful in another locality, would necessarily be unconstitutional, in which event the State must fail herein; but in *State* v. *Richardson,* 48 Or. 309 (85 Pac. 225 : 8 L. R. A. (N. S.) 362), this feature was held constitutional. It is clear, therefore, that to recognize the State's contention on this point as tenable would necessitate the overruling of all previous decisions directly or indirectly bearing upon the subject, to do which would be to disregard the well-recognized and universally conceded necessity for stability and uniformity in the construction and interpretation of law. It is the wisely established policy of all courts in English speaking countries not to set aside or disregard well-established precedents in order

to meet special emergencies. Were it otherwise, courts would become mere legal vanes, subject to change to suit varied, and often but temporary demands, as they may arise. "It is too evident to require discussion," says the author of pages 158 to 195 of 26 Am. & Eng. Enc. Law, "that the interests of the state and of the individual and the proper administration of justice require that there should be settled rules in these matters."

It follows from the foregoing views that the judgment of the trial court must be reversed; and, as this disposes of the case on the merits in favor of the defenndant, who has been admitted to bail, it is ordered that his bail be, and is hereby, exonerated.        REVERSED.

Mr. Justice McBRIDE and Mr. Justice SLATER concur.

MR. JUSTICE EAKIN delivered the following dissenting opinion:

There is no similarity between the Medford charter and that of St. Johns, either in its language or effect. The language of the Medford charter that takes it out of the local option law is that the city council shall have power and authority to "license, tax, regulate, or prohibit, barrooms, drinking shops * * irrespective of any general law in the State on the subject enacted by the legislature or by the people at large,' clearly showing a purpose to except it from the provisions of the local option law; while the language of the St. Johns charter is that the council shall have the authority to "regulate and restrain * * barrooms * * the sale and disposal. * * No provisions of the law concerning the sale or disposition of any spirituous, vinous, fermented, or malt liquors in Multnomah County, shall apply to the sale or disposition of the same in the city of St. Johns," having reference only to license regulation, and cannot apply as a limitation upon the power of the State to prohibit such sales. The local option law contains no provision in regard to the license tax or the regulation of the business. The legislative policy in

granting municipal charters has always been to concede
to the city the license tax and the regulation of the busi-
ness under the license, and to exempt them from the oper-
ation of the State license law applicable to counties,
known as the "gallon law."   And, notwithstanding the
gallon law excepts cities from its operation, lest that ex-
ception may apply only to cities incorporated prior to the
date of the enactment, it has been common practice to put
such an exception in the later charters.   This clause in
the St. Johns charter is literally copied from the charter
of the city of Portland, granted in 1903, which antedates
the local option law, and had no reference to it, and evi-
dently the legislature had no other purpose in the case of
the St. Johns charter than to except it from the operation
of the gallon law.

Again, it will be noted that the St. Johns charter does
not empower the city to prohibit, but only to "regulate
and restrain" "the sale and disposition" of liquor.   This
we think does not empower it to prohibit sales.   It is so
expressly held in *City of Portland* v. *Schmidt*, 13 Or. 22
(6 Pac. 224), where Mr. Justice THAYER says: "There
can be no question that the power of the common council
in regard to the sale of liquor extends no further than to
license, tax, regulate and restrain barrooms and drinking
shops.   There is a provision in the charter empowering
the council to restrain intoxication; also a clause to pro-
vide for the good order of the city. * * The council
doubtless have power under them to prohibit the sale of
liquor upon particular days or at particular places, such
as upon a street, but not to prohibit their sale generally."
See also, Black, Intoxicating Liquors, Section 227.   In
23 Cyc. 69 it is said: "And although the municipality
may be given power to 'restrain' the sale of intoxicants,
this term is construed as equivalent to 'restrict,' and not
as equivalent to 'suppress,' and hence does not authorize
a prohibitory ordinance."   This is also the holding in

*Mernaugh* v. *City of Orlando,* 41 Fla. 433 (27 South. 34) ; *Steffy* v. *Town of Monroe City,* 135 Ind. 466 (35 N. E. 121: 41 Am. St. Rep. 436) ; *Logan City* v. *Buck,* 3 Utah 301 (2 Pac. 706). And these cases are all cited to this effect in 7 Words & Phrases, 6183. See, also, *Chicago Packing & Provision Co.* v. *City of Chicago,* 88 Ill. 221 (30 Am. Rep. 545) ; *Smith* v. *Town of Warrior,* 99 Ala. 481 (12 South. 418), however, holds to the contrary. *Vinson* v. *Town of Monticello,* 118 Ind. 103 (19 N. E. 734) is not in point, as it relates only to prohibition of sales without license, and, if the power to prohibit is not vested exclusively in the city, it must rest in the State. Therefore, after Precinct No. 91 voted for prohibition, the city had no authority to issue a license for the sale of intoxicants therein.

MR. CHIEF JUSTICE MOORE concurs in this dissent.

———————

Decided December 21, 1909.

ON MOTION TO AFFIRM JUDGMENT AND FOR REHEARING.

[105 Pac. 884.]

In support of motion, in the first instance, appeared *Mr. Andrew M. Crawford,* Attorney General, and *Mr. Joseph H. Page,* Deputy District Attorney.

In opposition there was a brief over the names of *Mr. Thomas O'Day,* for appellant, and *Mr. Martin L. Pipes, amicus curiae.* Also a brief *amicus curiae* by *Mr. William D. Fenton.\** In opposition to the motion there was a brief, *amicus curiae,* over the names of the following counsel: *Mr. A. E. Clark, Mr. Charles H. Carey, Mr. Stewart B. Linthicum, Mr. M. G. Munley, Mr. Dan J. Malarkey, Mr. John F. Logan, Mr. William W. Cotton, Messrs. Platt & Platt, Mr. John P. Kavanaugh, Mr. James B. Kerr, Mr. Samuel B. Huston, Messrs. Bauer &*

———————

*For brief (opinion) in full submitted by Mr. Fenton, see Oregon Historical Society publication. Vol. XI, page 82, for March, 1910.— *Reporter.*

*Greene, Mr. Arthur C. Spencer, Messrs. Veazie &*
*Veazie, Mr. John H. Hall, Mr. Franklin T. Griwth, Mr.*
*Alex Bernstein, Mr. D. Solis Cohen, Mr. Cicero M. Idle-*
*man, Messrs. Cole & Cole, Mr. William T. Muir, Mr.*
*Ralph W. Wilbur, Messrs. Kollock & Zollinger, Messrs.*
*Granam, Cleeton & Davis, Mr. Roger B. Sinnot, Mr. Har-*
*rison Allen, Mr. Schuyler C. Spencer, Mr. Ralph E.*
*Moody, Mr. Russell E. Sewall, Mr. Milton W. Smith,*
*Messrs. Conley & De Neffe, Mr. William Brewster, Mr.*
*W. C. Benbow, Mr. John Manning, Mr. Warren E.*
*Thomas, Mr. Jerry Bronaugh, Mr. Gustavus C. Moser,*
*Mr. John C. McCue, Mr. John H. Stevenson, Mr. William*
*W. Banks, Mr. Charles J. Schnabel, Mr. W. P. La Roche,*
*Mr. Allan R. Joy, Mr. J. H. Middleton, Messrs. McAllister*
*& Upton, Mr. John A. Collier, Mr. H. E. Collier, Mr.*
*Arthur C. Emmons, Mr. J. Frank Shelton, Mr. James*
*McCain, Mr. Frank W. Fenton, Mr. W. T. Vinton, Mr. B.*
*A. Kliks, Mr. Joseph E. Hedges, Mr. Edmund B. Tongue,*
*Mr. C. A. Hardy, Mr. John A. Carson, Mr. William H.*
*Holmes, Mr. William M. Kaiser, Mr. Nehemiah L. Butler,*
*Mr. Oscar Hayter, Mr. Joseph E. Sibley, Mr. Gale S. Hill,*
*Mr. Walter L. Tooze, Jr., Mr. W. R. Bilyeu, Mr. James K.*
*Weatherford, Mr. Percy R. Kelly, Mr. John J. Whitney,*
*Mr. W. S. McFadden, Mr. J. F. Yates, Mr. E. R. Bryson,*
*Mr.E.E.Wilson, Mr.Edward D.Horgan, Mr.George Den-*
*man, Mr. John A. Buchanan, Mr. W. Lair Thompson, Mr.*
*Alfred S. Bennett, Mr. Clinton E. Woodson, Mr. Stephen*
*A. Lowell, Mr. John P. Winter, Mr. Roscoe R. Johnson,*
*Mr. Turner Oliver, Mr. William Miller, Mr. John L. Rand,*
*Mr. Julius N. Hart, Mr. M. L. Olmsted, Mr. Samuel*
*White. Mr. James R. Nichols, Messrs. Brook & Tomlinson,*
*Mr. R. G. Wheeler, Mr. George W. Hayes, Mr. C. H.*
*Leonard, Mr. Charles L. McNary,* and *Mr. John H.*
*McNary.* In reply, supporting the motion, there was a
brief over the names of *Mr. Andrew M. Crawford,* Attor-
ney General, *Mr. George J. Cameron,* District Attorney,

*Mr. Joseph H. Pages,* Deputy District Attorney, and *A. King Wilson,* for respondent.

MR. JUSTICE MCBRIDE delivered the opinion of the court.

5. The Attorney General and one of the deputy district attorneys for Multnomah County, on behalf of the plaintiff, by a motion calling for the issuance of a mandate affirming the judgment of the trial court in the above cause, seek to question the constitutionality of Chapter 50, p. 99, Laws 1909. This act increases the number of justices, comprising this court, from three to five, and provides for the immediate appointment by the Governor of two justices, in addition to those already in office, to hold until their successors are elected and qualified. Under its provisions Mr. Justice KING and Mr. Justice SLATER were, on February 12, 1909, by the Governor, appointed justices of this court, took their oaths of office, and, in the manner provided by the act, entered upon their duties, and have at all times since been acting in that capacity, recognized as such by their associates, as well as by the executive, and all other departments and officials of the State, including the Attorney General and district attorneys, as well as by all other counsel having business before this court.

The former opinion in this cause, being the one giving rise to this controversy, was prepared by Mr. Justice KING and concurred in by Mr. Justice SLATER and by the writer of this opinion, but dissented from in an opinion by Mr. Justice EAKIN, in which dissent Mr. Chief Justice MOORE concurred. See 55 Or. —— (104 Pac. 419.) By the motion, and argument in its support, it is insisted that the lawfully constituted court consists of Chief Justice MOORE, Justice EAKIN, and the writer, who hold their respective offices under laws in force prior to the act brought in question, by reason of which it is contended

that Chief Justice MOORE and Mr. Justice EAKIN consti-
tute a majority of the legally constituted court, and that
their opinion should be treated as the majority opinion,
and the maporlty opinion as filed be deemed a dissenting
opinion only.

A peculiar situation confronts us at the very threshold
of this proceeding.  The motion is not addressed to those
members of this body, who, it is claimed by the plaintiff,
are the constitutional judges, but it is addressed to the
court, consisting *de facto* of five persons; each claiming
to be a justice.  If the three first named are to pass on the
question in the collateral and indirect manner in which it
is presented, they must say to Justices KING and SLATER:
"Gentlemen, we are the legitimate justices of this court,
and you are intruders.  You will therefore retire, while
we proceed to discuss the question as to whether three or
five justices constitute our legitimate membership."  In
other words, we would thus be required to decide the
merits of the controversy before the hearing.  Or if all
five of the justices sit at the hearing, and one of them
should agree with Justices KING and SLATER that the
decision in *State* v. *Cochran* was propertly rendered by a
constitutionally organized court, the question attempted
to be raised on this motion would still be unsettled, for,
unless all three of the justices, excepting KING and
SLATER, concurred in condemning the constitutionality of
the act, a majority of the court *de facto* would be in favor
of its validity, and the matter would resolve itself into a
struggle as to who would be recognized by the officers of
the court and the State officials.  However, the gentlemen
whose tenure of office is indirectly attacked by this mo-
tion, have seen fit to submit its decision to that part of the
membership of this court whose title is unassailed, by
reason of which the contingencies here suggested will not
actually arise; but the fact that they might properly so
arise furnishes some justification for the theory, which

we think, in view of a precedent (to which we will later refer) of this court, it is unnecessary to adopt, that the question here presented belongs to the domain of legislation rather than judicial determination, or at least that, in the manner here presented, it is not properly before the court.

If the question were before the court for the first time, we might hesitate to pass upon it, especially in the form here introduced. The points presented have seldom arisen in this country; but there is respectable authority to the effect that they are political, and therefore not subject to review by the courts, and, notwithstanding the views to follow, we deem it not inappropriate at this time, before proceeding with a discussion of the merits, to call attention to the opinions of some other courts relative thereto.

In the case of *Luther* v. *Borden,* 7 How. 1 (12 L. Ed. 581) a similar question was raised. In that case the people of the state of Rhode Island had become dissatisfied with their government. Rhode Island, when it entered the Union, did not adopt a constitution, but continued its government under a charter received from Charles II. Its legislature, under the charter government, delayed, or refused to authorize by law, the calling of a constitutional convention to adopt a new constitution. A number of its citizens, claiming to be a majority, assembled, and, holding a constitutional convention, and subsequently, an election under the constitution there adopted, elected executive, legislative, and judicial officers, and pretended to go into operation as a full-fledged government. The existing government resisted this as an insurrection and declared martial law, arresting the movers thereof and imprisoning them. In a case involving the authority of the charter government to make these arrests, it was contended that the new government was at the time the legitimate government, and that the charter government had been superseded. Afterwards the char-

ter government called a constitutional convention, adopted a constitution, an dinstituted courts thereunder. Before one of these courts, so instituted by the charter government, the contention was made that the very government from which it held its commission was not the legitimate government at the time of the acts referred to. If such a contention could be made in that court, necessarily the effect of the decision would have been to invalidate the authority of the government, and, accordingly, the court trying the cause. Concerning that question the Supreme Court of the United States, at page 40 of the opinion in 7 How. (12 L. Ed. 581, say: "Indeed, we do not see how the question could be tried and judicially decided in a state court. Judicial power presupposes an established government capable of enacting laws and enforcing their execution, and of appointing judges to expound and administer them. The acceptance of the judicial office is a recognition of the authority of the government from which it is derived; and, if the authority of that government is annulled and overthrown, the power of its courts and other officers is annulled with it; and if a state court should enter upon the inquiry proposed in this case, and should come to the conclusion that the government under which it acted had been put aside and displaced by an opposing government, it would cease to be a court, and be incapable of pronouncing a judicial decision upon the question it undertook to try. If it decides at all as a court, it necessarily affirms the existence and authority of the government under which it is exercising judicial power."

In the case of *Brittle* v. *People*, 2 Neb. 198, the right of a colored man to sit upon a jury was questioned, the outcome of which depended upon whether or not the constitution of Nebraska was in force, in considering which Mr. Justice CROUNSE, at page 214 of 2 Neb., speaking for the court, after discussing the principles thereby involved, said: "This, then, is the legitimate conclusion, fairly

stated as I believe, that must or may follow from any attempt on our part to treat as judicial those questions which are solely political. We are not only able to destroy an entire state government, but, at the same time, present the singular spectacle of a court sitting as a court to declare that we are not a court."

*In re Ah Lee* (D. C.) 5 Fed. 899, 908, the court had under consideration some of the provisions of the constitution here involved. It was a *habeas corpus* proceeding, and there argued that the circuit as well as supreme judges were not *dè facto* officers. The contention was stated (and the same point is urged here) by the court as follows: "That a person cannot be considered an officer *de facto* unless the office he is said to be in legally exists, and, there being no such office as circuit judge or judge of the circuit court established by the constitution, the person who acted as judge on the trial of the petitioner in the court below was not even a *de facto* judge." It will be remembered that the original constitution did not create the office of circuit judge as such, but the supreme and circuit courts were created, which were to be filled by the justices as there designated. The court answered the question, stated in the above language, as follows: "As to the third point, it is sufficient to say that the constitution in effect creates a circuit court in each county to be held by a justice of the supreme court or a circuit judge, as the case may be, and such court is the office of the judge who holds it. A circuit judge's office is the circuit court in which he sits—the place which he fills—and such is the place or office filled by the person who acted as judge upon the trial of the petitioner." In conclusion the learned jurist held that, whether the law under which the circuit court and supreme judges were acting was unconstitutional or not, such officials were *de facto* officers, and the court was therefore precluded from further inquiry in relation thereto in that proceeding, which, as in the case

under consideration, was a collateral attack only. Among other cases bearing upon and sustaining the rule thus announced by Judge Deady, see, *Lang* v. *Bayonne,* 74 N. J. Law, 455 (68 Atl. 90: 15 L. R. A. (N. S.) 93: 122 Am. St. Rep. 391) ; *Walcott* v. *Wells,* 21 Nev. 47 (24 Pac. 367: 9 L. R. A. 59: 37 Am. St. Rep. 478) ; *Leach* v. *People,* 122 Ill. 420 (12 N. E. 726) ; *State ex rel.* v. *Ely,* 16 N. D. 569 (113 N. W. 711: 14 L. R. A. (N. S.) 638) ; *Donough* v. *Dewey,* 82 Mich. 309 (46 N. W. 782) ; *Burt* v. *Winona & St. P. Ry. Co.,* 31 Minn. 472 (18 N. W. 285) ; *State* v. *Gardner,* 54 Ohio St. 24 (42 N. E. 999: 31 L. R. A. 660) ; *Commonwealth* v. *McCombs,* 56 Pa. 436; *Parker* v. *State,* 133 Ind. 178 (32 N. E. 836: 33 N. E. 119: 18 L. R. A. 567.)

Respectable authorities, however, are cited by counsel for the plaintiff, holding to a different view to the last above considered, among which is *Norton* v. *Shelby County,* 118 U. S. 425 (6 Sup. Ct. 1121: 30 L. Ed. 178) ; but we deem it unnecessary to weigh them, or to determine their applicability to the case at bar, or to ascertain which is the better course to pursue, for a method of procedure, sufficient for this case, was adopted by the unanimous decision of this court in *Cline* v. *Greenwood,* 10 Or. 230, in which the constitutionality of the entire court was challenged collaterally. In that case, notwithstanding no question was raised as to the judges of the court being *de facto* officers, jurisdiction was entertained to determine the constitutionality of the official positions held by the members of the Supreme Court as first appointed and the question adjudicated, holding all proceedings pertaining thereto regular and in conformity with the provisions of Section 10, Article VII, of our constitution. At the time of the decision, Chief Justice LORD, and his associates, Justices WATSON and WALDO, were the members of the court, while their predecessors, whose decree was brought into question, were Chief Justice KELLY and associates,

Justices BOISE and PRIM; but, notwithstanding this difference in the personnel of the court, it was, in law, the same court, and the fact remains that the attack was collateral. In that case an appeal was taken from the circuit court to the Supreme Court, and there, as in the case under consideration, the decision of the trial court was reversed. See *Greenwood* v. *Cline*, 7 Or. 17. A decree was, accordingly, entered upon the mandate of the Supreme Court. Later the losing party on the appeal brought a suit to set aside this decree, on the ground that the Supreme Court, before whom the cause was tried and a decree entered, annulling the will there in controversy, was not organized in conformity with the constitution, in that the appointment of the members of the court by the Governor was in direct violation of Section 10 of Article VII of the constitution of the State. It will thus be seen that the proceedings there were in legal effect analogous to those taken here, except that here the collateral attack is made by motion in place of by suit, assailing the action of the alleged unconstitutional court. Until overruled that case is binding upon this court, and we do not entertain sufficient doubts, concerning the soundness of the course there pursued, to feel justified in disregarding or overruling the precedent thus established, and will therefore follow the method of procedure there adopted, and determine the points here presented on their merits.

6. This brings us to the inquiry presented by the plaintiff's motion; that is to say, is the act of 1909, under which Justices KING and SLATER were appointed, constitutional, or had the legislature the powed to increase the number of supreme judges, constituting this court, from three to five? But before entering upon a discussion of the various sections of our fundamental law, bearing upon this question, it is important that we call attention to the general rules of construction under which constitutions are universally interpreted. They may be summarized as follows:

The object and purpose of the law, whether fundamental or otherwise, must be considered; and the constitution must not be interpreted on narrow or technical principles, but liberally and on broad general lines, in order that it may accomplish the objects intended by it and carry out the principles of government. The whole constitution must be construed together.

7. When two constructions are possible, one of which raises a conflict or takes away the meaning of a section, sentence, phrase, or word, and the other does not, the latter construction must be adopted, or the interpretation which harmonizes the constitution as a whole must prevail.

8. In this connection it must also be kept in mind that the constitution of a state, unlike that of our national organic law, is one of limitation, and not a grant, of powers, and that any act adopted by the legislative department of the State, not prohibited by its fundamental laws, must be held valid; and this inhibition must expressly or impliedly be made to appear beyond a reasonable doubt.

9. The foregoing principles appear so well settled by a unanimity of decisions, not only in other jurisdictions, but by the courts of this State, since its inception, that they may be deemed elementary; but, since the construction so earnestly relied upon by the plaintiff would necessitate a disregard of the foregoing principles, we deem it appropriate to call attention to a few declarations of our courts upon the subject. Before doing so, however, we quote from that eminent text-writer and jurist, Judge Cooley, who, as an exponent of constitutional law, has no superior. In his work on Constitutional Limitations ([7 ed.] p. 241) he states the rule as follows: "It is to be borne in mind, however, that there is a broad difference between the constitution of the United States and the constitution of the states as regards the powers which may be exercised

under them. The government of the United States is one of enumerated powers; the governments of the states are possessed of all the general powers of legislation. When a law of Congress is assailed as void, we look in the national constitution to see if the grant of specified powers is broad enough to embrace it; but, when a state law is attacked on the same ground, it is presumably valid in any case, and this presumption is a conclusive one, unless in the constitution of the United States or of the state we are able to discoved that it is prohibited. We look in the Constitution of the United States for grants of legislative powed, but in the constitution of the state to ascertain if any limitations have been imposed upon the complete power with which the legislative department of the state was vested in its creation. Congress can pass no laws but such as the constitution authorizes either expressly or by clear implication, while the state legislature has jurisdiction of all subjects on which its legislation is not prohibited."

In *Cline* v. *Greenwood*, 10 Or. 230, 240, 241, Mr. Justice LORD, speaking for this court, states the principles of the constitutionality of legislative enactments thus: "But, did we entertain any doubt whether the legislature had exercised its power in the mode prescribed by the constitution, we should be compelled to dissolve that doubt in favor of the constitutionality of the mode which the legislature had adopted. Before a statute is declared void, in whole or in part, its repugnancy to the constitution ought to be clear and palpable and free from all doubt. Every intendment must be given in favor of its constitutionality. Able and learned judges have, with great unanimity, laid down and adhered to a rigid rule on this subject. Chief Justice MARSHALL, in *Fletcher* v. *Peck*, 6 Cranch, 128 (3 L. ed. 162); Chief Justice PARSONS, in *Kendall* v. *Kingston*, 5 Mass. 534; Chief Justice TILGHMAN, in *Farmers' & Mechanics' Bank* v. *Smith*, 3 Serg. & R. (Pa.)

72; Chief Justice SHAW, in *Inhabitants of Norwich* v. *Hampshire County Com'rs,* 13 Pick. (Mass.) 61; and Chief Justice SAVAGE, in Ex parte McCollum, 1 Cow. (N. Y.) 564—have, with one voice, declared that 'it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts be considered void. The opposition between the constitution and the law should be such that the people (judge) feel a clear and strong conviction of their incompatibility with each other.' " In *Crowley* v. *State,* 11 Or. 512 (6 Pac. 70), the same eminent jurist further remarked: "A statute will not be declared void, in whole or in part, unless its invalidity is distinctly pointed out and made clearly manifest. The general rule is that every intendment must be given in its favor." Soon afterwards this court, in passing upon the subject, in an opinion by Mr. Justice WALDO, in *Crawford* v. *Linn Co.,* 11 Or. 482, 486 (5 Pac. 738, 740), after observing that, where it appears that an act is in violation of either the state or national constitutions, it must be held invalid, observes: "But beyond this, there lies a vast field of power granted to the legislature by the general words of the constitution, and not reserved, prohibited, or given away to others. Of this field the general assembly is entitled to the full and uncontrolled possession. Their use of it can be limited only by their own discretion. 'There is nothing more easy than to imagine a thousand tyrannical things, which the legislature may do if its members forget all their duties, disregard utterly the obligations which they owe to their constituents, and recklessly determine to trample on right and justice; but to take away the power from the legislature because they may abuse it, and give to the judges the right of controlling it, would not be advancing a single step, since the judges can be imagined to be as corrupt and wicked as legislators.' " In *David* v. *Portland Water Committee,* 14

Or. 98, 109 (12 Pac. 174, 178), Mr. Justice THAYER says: "The people of this State possessed originally all legislative power subject to the restrictions contained in the constitution of the United States, and they have invested the legislative assembly with that power to the fullest extent, except so far as they expressly inhibited its exercise as before suggested. The question in such cases is not as to the extent of power that has been delegated by the people to the legislative assembly, but as to the limitations they have imposed upon that body." in the recent case of *State* v. *Walton,* 53 Or. 557 (99 Pac. 431), it was urged that the indictment was insufficient for the reason that it was not signed by the district attorney, but by his deputy, in discussing which Mr. Justice BEAN, for this court, held: "The office of the prosecuting attorney is provided for, and its duties defined, in part, by the constitution, Section 17, Article VII. The office therefore cannot be abolished or the constitutional duties thereof abridged by the legislature; but there is nothing in the constitution which restricts the legislature or lawmaking power from providing that such officer may have deputies to act in his name and stead." It is then held that the office of deputy prosecuting attorney, for the reasons stated, was legally created by legisltive enactment. Among numerous other adjudications in this State, holding to the same effect, are: *Kadderly* v. *Portland,* 44 Or. 118, 143 (74 Pac. 710: 75 Pac. 222) ; *State ex rel.* v. *Steel,* 39 Or. 419, 427 (65 Pac. 515) ; *Cook* v. *Port of Portland,* 20 Or. 580 (27 Pac. 263: 13 L. R. A. 533) ; *Simon* v. *Northrup,* 27 Or. 487 (40 Pac. 560: 30 L. R. A. 171) ; *State* v. *Lord,* 28 Or. 498, 530 (43 Pac. 471: 31 L. R. A. 473) ; *Ellis* v. *Frazier,* 38 Or. 462 (63 Pac. 642: 53 L. R. A. 454) ; *Dean* v. *Bridge Co.,* 22 Or. 167 (29 Pac. 440: 15 L. R. A. 614) ; *Cresap* v. *Gray,* 10 Or. 342, 349. See, also, 6 Am. & Eng. Enc. Law, 934; *Cooley* v. *Board,* 12 How. 315 (13 L. Ed. 996) ; *State* v. *Harrison,* 116 Ind. 300 (19 N. E. 146) ; *Commonwealth*

v. *Maxwell,* 27 Pa. 444, 453; *Bushnell* v. *Beloit,* 10 Wis. 195, 225.

Bearing in mind the fundamental principles of constitutional construction, let us examine the provisions of our constitution bearing upon the creation and perpetuity of our judicial system, for the purpose of ascertaining whether it is there disclosed that the number of justices to constitute the Supreme Court should be perpetually restricted to three, or whether, by express terms or clear implication, any provisions are disclosed inhibiting the lawmaking department of our State from providing that a greater number of justices may constitute the court. Section 10 of our Bill of Rights expressly declares that "justice shall be administered openly without purchase, completely and without delay, and that every man shall have remedy by due course of law for injury done him, in person, property or reputation." This is one among other provisions, says the preamble, "is to the end that justice be established, order maintained, and liberty perpetuated." Keeping this object in view, the constitutional convention, which included many lawyers, a large number of whom have since ranked among the leading counsel of our State and nation, made provision for a judicial department. This provision comprises most of Article VII, the first section of which declares that "the judicial power of the State shall be vested in a Supreme Court, circuit courts and county courts. * *'" Other sections on the subject, material to this controversy, are as follow:

"Sec. 2. The Supreme Court shall consist of four justices, to be chosen in districts by the electors thereof, who shall be citizens of the United States, and who shall have resided in the State at least three years next preceding their election, and after their election to reside in their respective districts. The number of justices and districts may be increased, but shall notexceed five, until the white population of the State shall amount to one hundred thousand, and shall never exceed seven; and the boundaries

of districts may be changed, but no change of district shall have the effect to remove a judge from office, or require him to change his residence without his consent.

"Sec. 3. The judges first chosen under this constitution shall allot among themselves their terms of office, so that the term of one of them shall expire in two years, one in four years and two in six years, and thereafter one or more shall be chosen every two years, to serve for the term of six years.

"Sec. 4. Every vacancy in the office of judge of the Supreme Court shall be filled by election for the remainder of the vacant term, unless it would expire at the next election, and until so filled, or when it would so expire, the governor shall fill the vacancy by appointment.

"Sec. 5. The judge who has the shortest term to serve, or the oldest of several having such shortest term, and not holding by appointment, shall be the Chief Justice."

"Sec. 10. When the white population of the State shall amount to two hundred thousand, the legislative assembly may provide for the election of supreme and circuit judges in distinct classes, one of which classes shall consist of three justices of the Supreme Court, who shall not perform circuit duty, and the other class shall consist of the necessary number of circuit judges, who shall hold full terms without allotment, and who shall take the same oath as the supreme judges."

It will be observed that the Supreme Court is created by Section 2, which first provides the number shall consist of four, and until the population reaches a certain limit, shall not exceed five, but that after the population reaches 100,000 the number of justices of the Supreme Court may be further increased, but shall never exceed seven. While provision is made to the effect that the justices may be elected by districts and may perform circuit duty, they remain justices of the Supreme Court, and the judges of circuit courts are left to be provided for by Section 10, which continues the subject by declaring that when the population reaches 200,000 the legislative assembly shall make provision for circuit judges and divide the judiciary into two distinct classes, one of which shall perform

Supreme Court duties only, and the other circuit duties.
Prior to the act of 1878 (Laws 1878, p. 31), there were no
circuit judges.   There were circuit courts; but, under
Section 8, Article VII, each of these courts was presided
over by a justice of the Supreme Court.   This is the effect
of the holding in *State* v. *Ware,* 13 Or. 380, 393, 394 (10
Pac. 885, 893), in which case Mr. Justice LORD says:
"The truth is, when the act of 1878 made operative Sec-
tion 10 of the constitution, the effect was to write into
these provisions, 'circuit judge.' "   Applying the same
reasoning here, when the act of 1878 provided there
should be five circuit judges, it, in effect, wrote into Sec-
tion 10 the words, "the white population having reached
200,000, five are the 'necessary number of circuit judges,'
so that Section 10, in effect, then read:   The Supreme
and circuit judges are divided into distinct classes, one
of which shall consist of three justice of the Supreme
Court, and the other of five circuit judges.   Had the sec-
tion declared the number of circuit judges, which should
be selected when the population reached that stage, and
then provided that thereafter provision be made for such
additional number as might be deemed necessary, and
remained silent as to the number of supreme judges that
might be provided for in the future, there might be some
merit, assuming Section 2 could not be construed with
Section 10, in the contention that the number of supreme
judges were, by Section 10, intended to be limited to three.
But it will be noted, in this connection, that Section 2 pro-
vided the minimum number as four, of which, under Sec-
tion 6, on account of one of the number having tried the
case appealed, but three justices could sit on an appeal;
thus, so far as the hearing of appeals was concerned, be-
ginning with but three (the number selected when Section
2 became effective), and placing the maximum at seven,
and if, when the 200,000 population mark was reached,
Section 10 eliminated all of Section 2, (which we do not

decide), it must necessarily follow that the limitation placed upon the number of supreme judges ceased when Section 2 became inoperative and Section 10 went into effect. This necessarily implies that, of the framers of the constitution found it necessary to expressly state the limitation that should be in force until the population reached the limit specified in Section 10, they would, had they deemed a limitation advisable, have also so expressly stated in the section supplanting Section 2. However, we find them, in effect, providing that, the moment the State attains the required population, there shall be three supreme judges and as many circuit judges as may at that time be found advisable. The number, which the legislature at that particular time found to be necessary "properly to perform circuit duty," was fixed at five, which, when read with Section 10 of the constitution, under which the law permitting the appointment of the five circuit judges was enacted, was equivalent to saying that, when the population reached 200,000, the Supreme Court should consist of three and the circuit court of five judges and, as no reference is made to the number that may be provided for in either office after that time, it would necessarily follow, if the contention of those appearing for the motion were tenable, that the number of circuit judges should never exceed five, yet we have never heard of any one suggesting that such a limitation was intended for the circuit courts. The absurdity of maintaining that such a limitation was intended for the circuit courts could and would not be entertained for a moment, yet it is manifest that if the rule of construction insisted upon, limiting the membership of this court to three, is sound, a like construction must be applied to the circuit judges, and they would therefore be limited to the number, which the legislature found to be necessary at the time the population reached the required limit.

Aside from this feature, however, it must be remembered that there are other provisions upon the subject,

and, in order to ascertain upon what theory of construction the framers were acting at the time of the adoption of our organic law, the constitution must be examined as a whole. As before stated, that memorable body was composed largely of eminent lawyers, several of whom afterwards sat on the federal, circuit and supreme benches in this State. They were familiar with the rules of constitutional construction, among which is that the fundamental law of a state is a limitation and not a grant of powers, and, examining the constitution as a whole, it is clear it was framed with this rule in view, and that wherever a limitation was intended it was so expressed. To illustrate: In Article II, we find numerous limitations. Section 2 places an express limitation upon the class that may be entitled to the privilege of elector, supplemented by other limitations in each of the three sections following. Sections 10, 11, and 12 place limitations upon the class of persons entitled to hold offices there specified; Section 13, that no elector shall be required to serve in the militia on election day; Section 16, that excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments be inflicted, etc. Similar limitations, with reference to various matters, are also found in each of the remaining 19 section (except one) of the Bill of Rights. Section 24 thereof provides that "treason against the State shall consist only in levying war against it. * *" If the words "shall consist" import a prohibition or restraint, why was the word "only" used? Evidently upon the theory that where no restraint is indicated, none exists.

Article II of the constitution relates to suffrages and elections. Section 2 of this article provides that every white male citizen of the United States of the age of 21 years and upwards, who shall have resided in the State during the six months immediately preceding such election, and every white male of foreign birth, who shall

have declared his intention to become a citizen, shall be entitled to vote at all elections. Now, under the construction here contended for by plaintiff, this language would exclude from the benefits of suffrage every person other than white males, but, recognizing that an express limitation was necessary to exclude negroes and Chinamen, Section 6 was added, as follows: "No negro, Chinaman, or mulatto shall be entitled to suffrage." See, also, Sections 3, 4, and 5 of same article, expressly excluding other classes. Further examination of the constitution discloses that provisions restricting and prohibiting are to be found in Sections 3, 4, 5, 7, 9. 10, 11, and 13, Article II; Sections 2, 8, 22, 23, 24, 27, 28, 29, and 30, Article IV; Sections 2, 3, and 15, Article V; Sections 1 and 8, Article VI. Other restrictions may be enumerated; but the above should be sufficient to illustrate the fallacy of plaintiff's position. It is sufficient to say that, wherever in the constitution a restriction or prohibition was intended, it was either expressed or so strongly implied as to be free from reasonable doubt, and this was manifestly done in the light of the then well-settled doctrine of constitutional construction that every power not prohibited may be exercised by the legislature. We will call attention, however, to one or two more limitations, which we deem distinctly denote that when a limitation was intended by the constitution it was there clearly indicated.

Article IV of the constitution relates to the legislative department, Section 2 of which provides: "The Senate shall consist of 16 and the House of Representatives of 34 members, which number shall not be increased until the year 1860. * *" It will be noticed that notwithstanding the first two clauses say the Senate shall consist of 16 and the House of Representatives of 34 members, and although this language is similar to that language employed with reference to the number to constitute the Supreme Court, clearly the framers were not of the opinion

that this language imposed a restriction against an increase, and hence, although the number to constitute the two bodies was enumerated, added an express declaration that this number should not be increased until a given time. And Section 29 of Article IV, in fixing the compensation of the members of the legislature, expressly states that they "shall receive for their services a sum not exceeding $3 a day from the commencement of the session; but such pay shall not exceed in the aggregate $120 for per diem allowance for any one session." Why employ these restrictions, if it were sufficient merely to say that the Senate shall consist of a certain number of members and the House of a certain number, and their their compensation shall be $3 per day? It is manifest that these restrictive words were employed because the constitutional convention knew that every restriction and prohibition in a state constitution must be clearly stated, and that the lawmaking department has plenary power, except as restrained, either expressly or by clear implication by constitutional prohibitions. There is one other section, included with those quoted in the beginning of this opinion, which is very indicative of a full realization on the part of the framers that there would in time, under the constitution, be more than three justices. Section 5, Article VII, makes provision as to who shall be Chief Justice by saying that "the judge who has the shortest term to serve, or the oldest of several having such shortest term, and not holding by appointment, shall be the Chief Justice." It requires but a moment's reflection (after comparing this section with Section 3) to see that, so long as there are but three justices, there cannot be two holding terms of equal length. It is no answer to say that this had reference only to those who might be selected under Section 2, for there are are not only no qualifying words or exceptions in the section in indicate such limitation, but if, as contended, when the act of 1878 brought Section 10 into operation,

it blotted out all trace of Section 2, such annihilation, if it had that effect, would also have carried with it Section 5. This court, however, by its continuous selection and recognition of Chief Justices under Section 5, at all times since the act of 1878, as well as before, has impliedly at least, interpreted this section to be in full force and effect.

If the maxim, *"expressio unius est exclusio alterius,"* so much relied upon by counsel for the motion, is pertinent in this cause, its application must be general to all similar clauses where State or district officers are specified. For example, Section 17 of the article under consideration provides for prosecuting attorneys, and defines, generally, their powers and duties. They are the prosecuting officers of the State, yet the office of deputy prosecuting attorney is provided for, and, by virtue of the act authorizing such appointments, the able deputy district attorney from Multnomah County appears on the motion in this contention. The constitution also provides for certain State officers, but nowhere provides for the office of Attorney General, and expressly declares (Section 17, Article VI), that the prosecuting attorneys shall be the law officers of the State. If the designation, or enumeration, of certain officers takes from the legislature the power to provide for others as the growing needs of public business demand, then the official positions of both the distinguished counsel, who subscribed to the motion, are shriveled to nothingness in the fires of their own logic, and they stand here mere intruders in the alleged offices which they assume to hold, and by virtue of which they assume the right to appear for plaintiff in support of this motion. Years ago, however, this court took a common-sense view of these provisions of the constitution, and, as already shown, so far as the office of deputy district attorney is concerned, held that, as the constitution did not prohibit the creation of that office, the legislature had the right to make provision therefor, and, as hereinbefore stated, up-

held an information filed by such officer in place of the principal: *State* v. *Walton,* 53 Or. 557 (99 Pac. 431.)

If the constitution had merely said the judicial power of the State shall be vested in a supreme judge, and contained no other provision bearing on the subject, the above maxim might be applicable. Such, for example, is the provision, with reference to the chief executive, which reads: "The chief executive power of the State shall be vested in a Governor. * *" Nothing is anywhere disclosed to indicate a possibility that more than one chief executive would ever be provided for; in fact, such is an impossibility, without an express provision indicating such an intent. Section 1 of Article VII, provides that the judicial power of a State shall consist of a Supreme Court, circuit and county courts, etc. The maxim mentioned also applies here, and the statement excludes all courts not there enumerated; but "a court," °and the members to compose it, presents a different question. And if the section or sentence relied upon under this rule stood alone, unaccompanied by any other provisions bearing on the subject, there might be room for discussion upon the subject; but, as remarked by Mr. Justice THAYER, in referring to the judiciary in his concurring opinion in *State* v. *Ware,* 13 Or. 402 (10 Pac. 898), "Our constitution upon the subject is *sui generis,* and must be interpreted in view of its various provisions and general scope and design." That is, the whole instrument must be examined with a, view to ascertaining the meaning of each and every part. Coke, Litt. 381*a*. In a written constitution the presumption and legal intendment is that each and every word, clause and sentence has been inserted for some useful purpose, for which reason the instrument must be construed as a whole; otherwise its intent and general purposes may not be ascertained. As a necessary result of this rule, it follows that, wherever it is practicable to do so, each provision must be so construced that it shall harmonize with

all others, without distorting the meaning of any of such provisions, to the end that the intent of the framers may be ascertained and carried out, and effect given to the whole instrument: 8 Cyc. 730; Cooley, Const. Lim. (7 ed.) p. 91; *French* v. *Teschemaker*, 24 Cal. 518, 539.

10. Then recurring to our Bill of Rights, its preamble declares that the constitution is ordaned "to the end that justice be established, order maintained, and liberty perpetuated,". and, section 10 thereof, that "justice shall be administered openly without purchase, completely and without delay, and every may shall have his remedy by due course of law for injury done him in person, property or reputation." Now, assuming the intention that the number of supreme judges should forever be limited to three, and that for all time the number of crcuit judges should remain five and no more, or should not exceed the number found necessary by the legislature when we reached the 200,000 mark, would not this intent also have to be considered along with the declarations last above referred to in our Bill of Rights? This would not only be essential to conform to the rules of construction laid down by Judge Cooley and all other text-writers on the subject, but also required in order that the general purpose of our fundamental law, as indicated by its preamble, should not be defeated. Unless this could be done, the very purpose of our State would, in time, be overthrown, for it is obvious that, if three supreme judges and five circuit judges were required to carry out the purpose of this instrument when the population reached but 200,000, a greater number of each would be required when the population should reach five times that number or more. Otherwise the delays necessarily incident to the trial of persons accused of violating the law, and determination of property interests, would inevitably amount, in a large proportion of the cases, to a denial of justice, deprivation of liberty, by long confinements awaitng trial, and, through the inadequacy of legal protection in many

instances, in the practical confiscation of property. It is but begging the question to say, as does counsel for plaintiff, that criminals do not complain of delays. It has for ages been recognized by all law-abiding citizens of English speaking nations that no one is, in law, deemed a criminal until convicted according to law, and also that not every man accused of a crime is guilty. It may be that persons having a full consciousness of guilt may not complain of delays, but those innocently accused do. It is also a well-recognized right, and the interests of state and nation demand, that, whether the accused be innocent or guilty, he is entitled to, and should have, a trial in manner provided by law without unnecessary delay. Nor does the fact that, in criminal cases, the right of appeal is "only a statutory privilege," as suggested, become material, for it may be said also that appeals in civil cases may not be taken until the procedure therefor is first provided by statute; but, in either event, the constitution contemplated that such appeal might be provided for, and it was with this in view that the constitutional provisions for the Supreme Court were inserted. The unfortunate conditions of affairs incident to long delays in matters involving not only property rights, but personal liberty, as well, of colonial days, contributed largely to the birth of our republic, and to the adoption of constitutions, national and state, under which the oppressions formerly existing have so long and justly been obviated. It is reasonable, then, to assume that nothing was intended in the adoption of our organic laws which could lead to such disastrous results. It is more rational, and but reasonable, to infer that it was intended the number of supreme judges, when the State reached the population requiring a separation into "distinct classes," should begin with three and no less, leaving the additional number to be determined under the future conditions as they might arise. This, our legislature, at its last session,

Sig. 7

determined and declared, and by the adoption of the act in question announced that the State had reached that stage of advancement where more members of this court had become essential to the carrying out the purposes of the constitution, as expressed in its preamble and in section 10 of the Bill of Rights. This was declared in clear and unequivocal language in the emergency clause of the act, as follows:

"Sec. 4. Inasmuch as the act of February 23, 1907, providing for the assistance of two commissioners to the Supreme Court is about to expire by limitation thereof, and said court is now about one year behind with the trial of cases now on its trial docket, and additional cases are being filed therein faster than three justices, unaided, can speedily hear and determine them, thereby indirectly and in effect contravening the provisions of the constitution 'that justice shall be administered without delay,' it is hereby declared that the status of affairs is such that the prompt enforcement of this act is necessary for the immediate preservation of the public peace and safety, and an emergency is hereby declared to exist, and this act shall be exempt from the power of the referendum, and shall take effect and be in full force and effect from and after its approval by the Governor." Laws 1909, p. 100.

We thus have a legislative interpretation declaring that the time had arrived when more judges were essential to a compliance with the command of our fundamental law "that justice shall be administered without delay." The authority to determine when the State has reached a point demanding such action rests with the lawmaking department only. Referring to this power, the principles applicable thereto are clearly, ably, and concisely stated by Mr. Justice BEAN, speaking for this court, as follows: "Most unquestionably those who make the laws are required, in the process of their enactment, to pass upon all questions of expediency and necessity connected therewith, and must therefore determine whether a given law is necessary for the preservation of the public peace,

health, and safety. It has always been the rule, and is now everywhere understood, that the judgment of the legislative and executive departments as to the wisdom, expediency, or necessity of any given law is conclusive on the courts, and cannot be reviewed or called in question by them. * * The existence of such necessity is therefore a question of fact, and the authority to determine such fact must rest somewhere. The constitution does not confer it upon any tribunal. It must therefore necessarily reside with that department of the government which is called upon to exercise the power. It is a question of which the legislature alone must be the judge, and, when it decides the fact to exist, its action is final." *Kadderly* v. *Portland,* 44 Or. 118, 148 (74 Pac. 710, 721: 75 Pac. 222).

Taking into consideration, then, the well-established principles enunciated in *Kadderly* v. *Portland,* the soundness of which is beyond question, it must follow that, under any view of the subject, when the legislature declared our State had reached a condition where, without an increase in the membership of our judiciary, the very purposes of the constitution as a whole would be defeated, it was its duly, and within its power, in the absence of a clear inhibition of the constitution to the contrary, to take such steps as it deemed essential for that purpose. Nor does the fact that a proposed amendment, including a provision that the number of justices shall be such as might be fixed by the lawmaking department, submitted to the people, and by their vote rejected, have any bearing upon the legal principles here involved. The proposed amendment included a proposed change of our entire judicial system, and the power there to be granted to our lawmakers to increase or decrease, at its will, the number of supreme judges, constituted but one of the proposed changes. It proposed to give the legislative department the right to abolish our present system of probate courts and county judges, leaving it optional

with the lawmaking power to say what district, county, and precinct officers should be provided for, and providing for their selection either by election or appointment. In short, it provided for an entire and radical change in the whole method of selecting judicial, district, county, and precinct officers.

It is not unusual for statutes, or even amendments to a constitution, to contain, along with proposed changes, some provisions already in force; but this is never taken as grounds for the interpretation of a section or provision already in force. A new Bill of Rights might be proposed and submitted to a vote, containing all the present sections, with many other declarations or sections added; but it would not be seriously contended that, if the proposition should be rejected by a vote of the people, by reason thereof our Bill of Rights was never a part of our fundamental laws. As to why the proposed change was defeated we need not inquire. It may have been on account of the proposed change in the entire system of judicial and district officers of the State, including the provisions therein to the effect that the right to provide for this new system contemplated taking from the county courts all probate jurisdiction; it may have been because it proposed to delegate to the lawmaking power the authority to increase or diminish the number of supreme judges, which, under the proposed system, might have been reduced to one member only, or increased without limit; or it may have been because of the proposed changes in the method of selecting district, county, and precinct officers, that induced its rejection by the people. Whatever may have been the moving cause of the defeat of the proposed amendment, the result thereof can in no manner be held to revolutionize the well-settled, and, we may add, elementary rules of construction, by which all courts, in their deliberations, are governed.

We are not unconscious of the fact that various constructions have been placed upon Article VII of the Con-

stitution, and of the different sections thereof, relative to the judiciary. The Governor, in recommending the passage of the law under consideration, took the position in his message to the legislature, at which the bill was enacted, that Section 2 and Section 10 of Article VII must be construed together, and that it must be inferred therefrom that the minimum number of judges should be three and the maximum seven, and this may have been the view of the legislature; but, whatever may have been its reasons for the conclusion reached, the fact remains that the judiciary committee (always composed of lawyers) in both branches of the legislature, as shown by the journals, reported the bill constitutional, which, when added to the legislative construction, which followed, as above indicated, is entitled to great weight. Prominent lawyers are found also, who have held that the three judges of the Supreme Court, under the law as first enacted (1878), are inhibited from performing circuit duty, while all the circuit judges may be called in to serve as supreme judges, as was done before the act of 1878. Others have been known to take the view that the three judges are limited to Supreme Court duties, while any additional supreme judges provided for may perform circuit duty, and that the additional judges may be elected by districts. Others differ from each of these views, and interpret the constitution as providing that the minimum shall be three, and the number that may be provided for by legislative action unlimited, while others hold to the view that but three members are permitted under the constitution, as contended for by counsel for plaintiff. To us the intention is clear. We hold that the lawmaking department may increase the number constituting the Supreme Court, that the Supreme and circuit courts are necessarily separate and distinct in their powers and duties, and that their duties are clearly pointed out. The number may be increased to seven at least; but whether, if the lawmakers should so decide,

it may exceed seven, we express no opinion, and we think it would be highly inappropriate for the present court to do so. Under the views here taken, and upon which our conclusion is predicated, that question is not before us, but is one which, in time, may be presented for the consideration of this court with another and increased membership, to the determination of which it should therefore be left.

In conclusion we will add that under any point of view it is manifest, from the various constructions placed by eminent counsel upon Article VII, however different they may be, in view of the legislative interpretation thereof, that, under light most unfavorable to the act in question, no one can say the constitution is free from ambiguity on the subject, or that such act under consideration is beyond a rational doubt unconstitutional. Placed therefore under the most damaging scrutiny possible, there is no escape from the conclusion that the legislative assembly did not, in the enactment of the law in question, exceed its constitutional powers. To hold otherwise would be to disregard, as hereinbefore disclosed, the well-settled rules of construction heretofore promulgated by an unbroken line of decisions by this court from the earliest history of our State.

MR. JUSTICE EAKIN delivered the following concurring opinion:

7. I fully concur in the opinion of Mr. Justice MCBRIDE. Article VII of the Constitution must be considered as one utterance of the organic law, notwithstanding it is subdivided into sections. Section 10 must be read as a part of sections 2 and 8, because it relates to the same identical matter. Neither section 10 nor section 2 creates the Supreme Court. That is accomplished by section 1. Section 2 provides for the number of justices, their qualifications, election, and duties. Section 10 provides that, when the population of the State has reached a

certain number, the legislature may provide for the election of three justices of the Supreme Court, who shall not perform circuit duties, and also provides for circuit judges. When these changes are effected, they supersede section 2 to that extent; but that section is not thereby rendered *functus officio.* It still provides for the qualifications of the justices of the Supreme Court and of the judges of the circuit court, namely, they must be citizens of the United States and must have resided in this State three years, and whether the clause to the effect that their number may be increased under certain conditions, up to a definite limit, is thereby annulled by the changes contemplated under section 10, it is not now necessary to decide. It is sufficient that section 10 does not in terms place a limit for the future on the number of justices of the Supreme Court. It is conceded that the legislature does not exercise the powers by virtue of the constitution; but, as said in Cooley's Constitutional Limitations (7 ed.) 126:

"In creating a legislative department, and conferring upon it legislative power, the people must be understood to have conferred the full and complete power as it rests in, and may be exercised by, the sovereign power of any country, subject only to such restrictions as they may have seen fit to impose, and to the limitations which are contained in the Constitution of the United States. The legislative department is not made a special agency for the exercise of specifically defined legislative powers, but is intrusted with the general authority to make laws at discretion."

Authorities to this effect are numerous. The same author, quoted above, in fifth edition, p. 207, said:

"When a state law is attacked, * * it is presumably valid in any case, and this presumption is a conclusive one, unless in the Constitution of the United States or of the state we are able to discover that it is prohibited. We look * * in the Constitution of the State to ascertain if any limitations have been imposed upon the complete power with which the legislative department of the

State was vested in its creation. Congress can pass no laws but such as the constitution authorizes either expressly or by clear implication; while the state legislature has jurisdiction of all subjects on which its legislation is not prohibited."

In *Bushnell* v. *Beloit,* 10 Wis. 225, the court says:

"We suppose it to be a well-settled political principle that the Constitution of the State is to be regarded, not as a grant of power, but rather as a limitation upon the powers of the legislature, and that it is competent for the legislature to exercise all legislative power not forbidden by the constitution or delegated to the general government, or prohibited by the Constitution of the United States."

This clause of section 10, in question, places no limitation upon the legislative power after the change there provided for has been made. The same phraseology, as to the number of justices, is used in section 2, namely, "the Supreme Court shall consist of four justices"; but that language is followed by a limitation, "shall never exceed seven." Section 10 provides that the Supreme Court "shall consist of three justices," without any words of limitation. In fact, section 10 must be construed as a proviso to both sections 2 and 8, and in the changed conditions they are still controlled by sections 3, 4, and 5. *State* v. *Ware,* 13 Or. 389 (10 Pac. 885). If section 10 was intended to contain any restriction, or one different from that contained in section 2, the addition of the word "only" or the words "and no more" would have readily accomplished that end. Throughout the constitution, we find restrictions and prohibitions indicating that its framers recognized the necessity thereof. If such a condition as this were in the United States Constitution, which is a grant of power beyond which Congress cannot go, it might well be said that its power would be limited to three justices; but the reverse is the case under a state constitution. The legislature has all power not taken away by the constitution. Before

a statute is declared unconstitutional, its repugnancy should be clear and free from doubt. In *Simon* v. *Northup,* 27 Or. 495 (40 Pac. 561: 30 L. R. A. 171) Mr. Chief Justice BEAN says:

"The courts will never exercise the extraordinary power of declaring an act of the legislature unconstitutional unless there is a plain, palpable, and clear conflict between the statute and the constitution."

In *re Wellington,* 16 Pick. (Mass.) 87 (26 Am. Dec. 631). In *Sinking Fund Cases,* 99 U. S. 718 (25 L. Ed. 496) it is said:

"Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule."

Every doubt must be resolved in favor of the legislative act. Every intendment must be given in favor of its constitutionality, and we are not justified in holding that the legislative act, increasing the number of justices of the Supreme Court to five, is unconstitutional.

Concurring opinion of MR. CHIEF JUSTICE MOORE.

Though adhering to the dissent as originally expressed, I concur in the conclusions reached by Mr. Justice MCBRIDE and Mr. Justice EAKIN, and, for reasons announced in their opinions herein, the motion and the petition for a rehearing are denied.

REVERSED: REHEARING DENIED.